**UNITED STATES of America, Plaintiff,**

v.

**Félix Benítez REXACH et al., Defendants.**
**Civ. No. 67–64.**

United States District Court,
D. Puerto Rico.
March 26, 1971.

Rene Benítez, San Juan, P. R., for plaintiff.

John J. McCarthy, Special U. S. Atty., Washington, D. C., for defendants.

## OPINION

CANCIO, Chief Judge.

This is an action brought pursuant to Sections 7401, 7402 and 7403 of the Internal Revenue Code and Sections 1340 and 1345 of Title 28 of the United States Code, on request of the Commissioner of Internal Revenue and under the direction of the Attorney General of the United States, filed February 10, 1964 to foreclose liens for income tax, interest and penalties assessed against defendant Félix Benítez Rexach for the calendar years 1959 and 1961, in the total sum of $2,934,098.57. The properties on which foreclosure is sought are the issued and outstanding stock of Escambrón Development Company, a Puerto Rican corporation, a parcel of land located in the Municipality of Bayamón, Puerto Rico, and a debt of said corporation, all belonging and owing at the time to the marital community of Mr. Benítez Rexach and his wife Lucienne D'Hotelle de Benítez Rexach, now deceased.

The case was tried before the late Judge Clemente Ruiz Nazario, who retired without having rendered a decision, and the parties by written stipulation submitted the case for decision to the Chief Judge of this Court upon the complete record of the trial before the late Judge Clemente Ruiz Nazario and additional evidence specified to be presented as follows:

"(a) Such relevant testimony of Mr. Arnold LaFontaine concerning the records of defendant, Félix Benítez Rexach which were recovered from the Dominican Government after the prior trial and which were made available for inspection and examination of plaintiff, as plaintiff wishes to present.

"(b) Such relevant testimony and other evidence as defendant wishes to present with respect to the alleged losses incurred by defendant as a result of the seizure and receivership of his Dominican business and properties by the Dominican Government from theft and shipwreck, and any depreciation of said properties."

The trial was continued before the Chief Judge and additional evidence presented by the parties pursuant to said stipulation.

In the trial before the late Judge Clemente Ruiz Nazario, the basic pleadings, and virtually all of the evidence consisting of sundry depositions, transcripts of trials and documentary evidence that had been presented in three previous cases between the parties (and described hereinafter) were presented in evidence.

Taxpayer, born in Vieques, Puerto Rico, March 27, 1886, became an American citizen under the provisions of the Act of March 2, 1917, commonly known as the Puerto Rico Organic Act of 1917. He was denaturalized July 14, 1958 by the State Department under Section 349 (a) of the Immigration and Naturalization Act (66 Stat. 163), but the Board of Review on the Loss of Nationality on June 25, 1962 held that the causes which lead to this denaturalization were the result of coercion and, hence, null and void ab initio.

The taxpayer and his wife, Lucienne D'Hotelle de Benítez Rexach, deceased, were married in Puerto Rico in 1927, and she became a naturalized United States citizen, but by a certificate dated

May 20, 1952 approved by the Delegate of the Secretary of State December 23, 1952, the State Department determined that Lucienne D'Hotelle de Benítez Rexach had lost her United States citizenship in 1949 under Section 404(b) of Chapter IV of the Nationality Act of 1940 and denaturalized her as of 1949. Subsequent to said determination she adopted Dominican Nationality. The taxpayer and his wife had never been legally separated or divorced; the first matrimonial domicile was in Puerto Rico, but since 1944 it has been uninterruptedly in the Dominican Republic where taxpayer resided from 1944 to 1962.

Mr. Benítez Rexach, now some 85 years of age, is a licensed engineer with some 50 years experience in the design and construction of harbors and harbor facilities and is recognized as one of the great engineers in connection with harbor works, although he holds no college or university degree. He dredged many of the harbors and constructed and maintained many of the harbor facilities in Puerto Rico, and he designed and constructed the harbors and harbor facilities in the Dominican Republic, including those at the Ports of Santo Domingo, San Pedro de Macoris, Puerto Plata, Barahona, Haina, Boca Chica and Azúa. During a period of some 27 years he dredged no less than 50,000,000 cubic yards of material in the Dominican Republic which, with the construction of harbor facilities and maintenance, embraced contracts with a total price of some $39,000,000.00. He also made the project for the harbor of LaGuaira in Venezuela and is familiar with dredging and harbor work construction in other parts of the world. All of the harbors and harbor facilities constructed by Mr. Benítez Rexach are now in use except the Customs House at the Port of Santo Domingo which was burned during the last revolution in that country. He also designed and constructed a graving dock and a shipyard in the Dominican Republic principally for the repair and maintenance of his floating equipment, machinery and equipment, consisting of a large hydraulic dredge, numerous barges, derricks, tankers, tugs, supply ships, and other auxiliary equipment for construction, including said graving dock and machine shops with the necessary machinery and equipment, and spare parts and supplies, all of which had an estimated value of approximately $4,000,000.00.

On March 3, 1958 plaintiff brought an action in this Court to foreclose liens on said stock, debt and land for taxes assessed in jeopardy assessments on income of taxpayer for the years 1951 to 1956, both inclusive, derived from harbor construction contracts with the Dominican Government, amounting in total to $2,354,478.48, including interest and fraud and other penalties. Prior to 1951 such income was not subject to taxation but under the amendments to the Internal Revenue Code plaintiff claimed that it was taxable. Taxpayer contended it was not, but this Court sustained plaintiff's claim. Taxpayer's Washington counsel had rendered an opinion to taxpayer that such income was not taxable and taxpayer had filed no returns for 1951 to 1956. The Commissioner determined that the profits from said contracts amounted to $\frac{1}{11}$ of the contract prices which he allocated in equal monthly amounts over the maximum number of months within which each contract was to be completed. In said determination no account was taken of whether the amount of the contract price had been uniformly received per month, the amount of work performed had been done uniformly per month nor whether the amount of cost or expense had been incurred uniformly per month over the maximum contract time for performance. In fact such was not the case, and payments were irregular, the Dominican Government being frequently in arrears in making payment, and in some instances payments were made in advance. In 1961 some $3,000,000.00 was owed him under contracts performed. Taxpayer did not keep or maintain adequate books and records from which the amount of his gross income, deductible

expenditures or net income with respect to said contracts could be determined, and he contended that 1/11 of the contract price was in excess of his profits, that a reasonable profit should not exceed 5% of the contract prices, that he had sustained losses on some contracts. The Court appointed a Special Master to determine the issue, but prior to trial taxpayer accepted the Commissioner's method of determination for the years involved in the assessment. In said case it was stipulated, and the Court so held, that taxpayer's wife, Lucienne D'Hotelle de Benítez Rexach, was a non-resident alien and the Court found and held that under Dominican law she had a vested one-half interest in the income earned from said contracts which was not taxable by the United States. It was also stipulated and held by the Court that taxpayer was entitled to a credit against his United States income tax on the taxable income from such contracts for the amount of the Dominican Gross Receipts tax when assessed by and paid to the Dominican Government. It was also found and held in said case by this Court that the fraud and other penalties were unlawfully assessed, (United States v. Rexach, D.C., 185 F.Supp. 465), and by amended judgment of August 7, 1962 a total of $76,866.01 in taxes with interest was held to be due by taxpayer, which judgment was paid.

In the meantime on June 9, 1959 taxpayer filed federal income tax returns for the year 1957 and the year 1958 (up to July 14, the time at which he was denaturalized by the State Department) in which he made determination of his profits from contracts with the Dominican Government by taking 1/11 of the contract prices and allocating profits just as the Commissioner had done for the years 1951 to 1956, both inclusive, and he reported one-half of said net income therefrom. The Commissioner assessed deficiency and jeopardy assessments for said years on the total of said profits so determined and on February 26, 1960 brought an action in this Court to foreclose liens for income taxes for the years 1957 and 1958 (up to July 14) on income from such contracts and other income amounting in total to $306,363.30 including fraud and other penalties. Profits from said contracts were also determined by the Commissioner as in the said returns in the same manner as for the years 1951 to 1956, both inclusive, and this method of determination was again accepted by taxpayer for the years involved, and again this Court held that taxpayer's wife, a non-resident alien, had a vested one-half interest in said income not subject to taxation by the United States, and dismissed the complaint, the Dominican tax credit assessed and paid being in excess of the amount of the tax under federal law (United States v. Rexach, D.C., 200 F.Supp. 494).

On July 2, 1962, all of the Dominican properties of taxpayer were seized by the Dominican Government and put in the hands of one Antonio Casals Piñeyro (a Cuban) as sequestrator pursuant to the order of a Dominican Court dated June 20, 1962

"* * * with power to administer them, to manage the different enterprises and businesses of defendant (Benítez Rexach), without altering their system of management and with power to receive the civil fruits therefrom, in the same manner as an attorney-in-fact; c.—It is ordered that the said sequestrator receive all of the movable and immovable properties which are the subject of this sequestration, under an inventory prepared in the presence of a Notary Public * * ; d—The Sequestrator already designated is authorized during his administration to draw against the accounts in the name of the defendant (Bank accounts)—for the payment of the wages of workers, employees, laborers, etc. and for his own fees, as well as for the purpose of paying the expenses of maintaining (said properties) with the obligation of rendering an accounting on the occasion of termination of the sequestration; e—(* * *.); f—(* * *.); g—To order the provisional execution of this order without

bond, notwithstanding any appeal against the same."

Four or five months thereafter Antonio Casals Piñeyro was indicted and sentenced for robbery and a Mr. Richardson was appointed and took over as sequestrator. The seizure was made suddenly by soldiers who took over everything including taxpayer's office and records and papers and he had to leave and thereafter had no access to his office, his residence was searched and he was able to save only a few of his papers. The Captain and crew of his dredge and Masters of his ships were ousted, the log of his dredge, of United States registry, was taken and the United States flag flown by it was taken down. Taxpayer thought no inventory was made at the time of seizure but subsequently one was made. The Dominican Dictator Trujillo had been assassinated in May 1961, and at the time, following a Coup de etat the "Consejo de Estado" took over the Dominican Government, under which one Mario Penso Fondeur was appointed Secretary of Public Works, who instituted a suit against taxpayer on behalf of the Dominican Government to recover $9,-000,000.00 in damages allegedly due because the harbor constructed by taxpayer at the Port of Santo Domingo was useless and had caused the destruction of Tourism, and it was in this suit that seizure and sequestration was ordered.

On July 6, 1962, following the nullification of taxpayer's denaturalization, he filed a federal amended tax return for 1958 (embracing the entire year) and federal income tax returns for the years 1959, 1960 and 1961, with letters attached to each explaining the reasons for delay in filing and stating:

"You will note from the letter of Montoya & Muñoz Veloso that due to the seizure by the present Dominican Government of all of the Dominican properties of Mr. Benítez Rexach, including his office and papers and records, these returns have been prepared as best they could be from data at hand which is not adequate. Mr. Benítez Rexach and his accountant have done the best they could do under the circumstances.

"Efforts are being made by Mr. Benítez Rexach for recovery of his properties, but due to the chaos and anarchy that prevails in the Dominican Republic it may be sometime before he is successful. If and when he recovers his records and papers he may submit amendments to these returns."

December 18, 1963 a jeopardy assessment was made against taxpayer for an income tax deficiency plus interest and fraud penalties for the year 1959 in the total amount of $662,052.62, and a jeopardy assessment for an income tax deficiency, interest and fraud penalty for the year 1961 in the total amount of $2,-272,042.95.

The present action was brought February 10, 1964 to foreclose liens on said Puerto Rican properties of taxpayer and his wife, Lucienne D'Hotelle de Benítez Rexach and recover the amount of said assessments for the years 1959 and 1961. The income on which the assessments were made except for a constructive dividend paid to taxpayer by Escambrón Development Company and except for an item of interest paid on his wife's bank account in New York, was income determined by the Commissioner as profits derived during said years by taxpayer from construction contracts with the Dominican Government part of the performance of which took place (except for the contract and supplemental contract for the construction of the Harbor and Harbor Facilities at the Port of Boca Chica hereinafter to be mentioned), and on which the Commissioner determined the profits to be 57½% of that portion of the contract prices allocated to said years instead of ⅟₁₁ of the contract prices determined by him and accepted and held to be valid by this Court in the previous cases, and used by taxpayer in his 1959 and 1961 returns except with respect to the Yuna-Barracote contract hereinafter to be mentioned. And again the assessment was made on the total of the profits without regard to the non-taxable one-

half vested interest of taxpayer's wife, a non-resident alien, and contrary to the holding of this Court in the previous cases.

Following filing by the taxpayer of his answer in the present case in which among others, the defenses of res judicata and estoppel were set up, plaintiff filed an amended complaint praying among other things that the judgments in the previous cases be set aside, and that plaintiff be relieved of its stipulations in the previous cases on the ground of fraud and deception of taxpayer alleged to consist in the following acts and things:

"1.—That Mr. Benítez had falsely stated under oath that his wife lost her United States citizenship prior to 1949 and acquired Dominican citizenship, and that he and his said wife changed their matrimonial residence and domicile from Puerto Rico to the Dominican Republic in 1944.

"2.—That he had fraudulently failed to disclose three certain contracts made in 1951 and 1952.

"3.—That he had fraudulently failed to disclose that he had paid to Rafael L. Trujillo Molina, then an official of the Dominican Republic, sums in the approximate amount of one-third of the face amounts of the contracts with said government, which payments were not proper and allowable deductions as business expenses.

"4.—That he had fraudulently denied that he had records which could be used to reconstruct his costs and income from contracts with the Dominican Republic during the years 1951 through 1958.

"5.—That in answer to interrogatories he had fraudulently stated that he had used and expended vast quantities of material and labor in the performance of said contracts which in fact he had not used or expended.

"6.—That he had conspired with Rafael L. Trujillo to obtain foreign tax credits by getting payments from the Dominican Government not in fact due, returning such payments to that government for taxes and using the receipts therefor to reduce his United States liability."

Following the taking by plaintiff of the deposition of former officials of the Dominican Government in which the testimony and official documents disclosed that plaintiff had paid his Dominican taxes and had not committed the acts described in paragraph 6 above, plaintiff withdrew the said amended complaint and on March 23, 1965 filed a new and separate action in this Court to set aside the judgments in the previous cases, and relieve plaintiff of its stipulations because of fraud and deception of taxpayer alleged to consist only of the acts and things set out in numbered paragraphs 2, 4 and 5 above and at the trial of this new case plaintiff abandoned its allegations of the acts and things set out in paragraphs 4 and 5 above. The Court found that there had been no fraud or deception of taxpayer and entered judgment dismissing the action. (United States v. Rexach, D.C., 41 F.R.D. 180).

The deficiency assessments for the year 1959 is made up as follows:

(a) Income derived from a contract with the Dominican Government, designated as Contract No. 182 (Customs House Building) in the amount of $700,000.00 executed July 24, 1958, and published in the official Gaceta No. 8278. Work on this contract was to commence August 1, 1958 and it was to be completed within 15 months. The monthly gross receipts from this contract were computed to be $46,666.66 per month (i. e. $700,000.00 ÷ 15 months), and work was to be in progress on this contract during ten months of 1959. The Commissioner determined that the gross receipts from this contract to be allocated to the year 1959 were $466,666.70 (i. e. 10 months × $46,-666.66 per month). Taxpayer in his

1959 return reported this contract with gross income also of $466,666.70 and computed his net profit as $\frac{1}{11}$ of the gross of $466,666.70 according to the determination in the previous cases, whereas the Commissioner assessed and maintained that taxpayer's net profits on this contract should be computed as being $57\frac{1}{2}\%$ of said gross of $466,666.70. The gross amount of the contract price allocable to the year 1958 was 5 months $\times$ $46,666.66, that is, $233,333.35 and in his 1958 amended federal return taxpayer reported $\frac{1}{11}$ of this amount as his net profit for 1958 derived from this contract. No deficiency had been assessed against him on his amended return for 1958.

(b) Income derived from a contract with the Dominican Government designated as Contract No. 90 (Construction of the Port of Azúa) in the amount of $4,750,000.00, executed April 19, 1956, published in the official Gaceta No. 7978. Work on this contract was to commence on May 1, 1956 and was to be completed within 35 months. The amount of monthly gross receipts allocated to this contract was $137,714.29 and work on this contract was taken to be 3 months of 1959. Thus gross receipts from this contract allocable to 1959 were therefore $407,142.72. In his 1959 return taxpayer reported $\frac{1}{11}$ of this gross amount as net profits as in the previous cases, but the Commissioner computed his profits as $57\frac{1}{2}\%$ of said gross amount. The profits from the 8 months of work on this contract in 1956 and the 12 months work on this contract in 1957 were computed and held by this Court in the previous cases to be $\frac{1}{11}$ of the gross amount allocable to these years, and in his amended return for 1958 and his return for 1957, plaintiff reported profits of $\frac{1}{11}$ of the allocable gross amount. There was no deficiency assessment on the amended return for 1958.

(c) Income derived from a contract with the Dominican Government known as Contract No. 182 in the amount of $200,000.00, executed July 24, 1958, published in the official Gaceta No. 8278. Work was to begin on this contract August 1, 1958 and be completed within 4 months. A profit of $\frac{1}{11}$ on the price of this contract was reported by taxpayer in his amended return for 1958, and no deficiency assessment was made with respect thereto. By written stipulation plaintiff concedes that profits on this contract were erroneously included in the 1959 deficiency assessment.

(d) Payments of $33,927.22 from Escambrón Development Company to taxpayer which the Commissioner determined to be constructive dividends made to taxpayer and which taxpayer claims to be a payment on account of the indebtedness due by the said corporation to the marital community of taxpayer, and his wife Lucienne D'Hotelle de Benítez Rexach, deceased.

(e) The amount of $216.00 as liability for self-employment tax.

(f) Normal deductions were allowed and made by the Commissioner including the amount of $50,000.00 as a reasonable exempt earned income tax allowance under Section 911 of the Internal Revenue Code of 1954.

(g) Plaintiff conceded by written stipulation that it was error to tax all of said income of taxpayer and that plaintiff is bound by the judgments of this Court in previous cases holding that a one-half vested interest in income derived from said construction contracts belonged to his said wife, a non-resident alien, and which is not taxable by the United States.

(h) A penalty for fraud was asserted and imposed by the Commissioner of 50% of the tax computed by him under Section 6653(b) of the Internal Revenue Code. Taxpayer claims

that the penalty was unlawfully assessed.

The said deficiency assessment for the year 1961 was made up as follows:

(a) Income derived from a contract with the Dominican Government designated as Contract No. 33 (Yuma Contract), executed April 9, 1961 for the price of $4,700,000.00 and published in the official Gaceta No. 8576. Taxpayer was paid $200,000.00 on account of this contract in 1961, and it was suspended by order of the Dominican Government in June 1961. Taxpayer is presently controverting with the Dominican Government the right to suspend said contract and the right of taxpayer to damages. The Commissioner determined that the profits from this contract were 57½% of $200,000.00. In his return for 1961 taxpayer showed and claimed a loss on this contract of not less than $208,934.72 which the Commissioner in his assessment disallowed.

(b) Payment made to taxpayer by the Dominican Government of $1,552,000.00 in settlement of his claim for compensation for dredging of rock during the performance of the contract and supplement thereto for construction of the harbor and harbor works at the Port of Boca Chica under Contract dated August 3, 1955 approved by Congressional Resolution No. 4300 and published in the official Gaceta No. 7901, for the total amount of $3,500,000.00, the items of work to be performed thereunder being as follows:

(1) Construction of 2,000 linear feet of wharves _____ $2,000,000.00

(2) Construction of 10 steel guards __ 100,000.00

(3) Dredging entrance channel of the harbor to a minimum depth of 32 feet representing a total of approximately 2,000,000 cubic yards _____ 1,200,000.00

(4) Construction of roadway 2,000 feet long with a curb and culvert of reinforced concrete and surfaced with asphalt concrete ____ 200,000.00

Total: $3,500,000.00

By the supplemental contract of July 2, 1956 in the amount of $380,000.00 construction of a warehouse with reinforced concrete wall, steel frame, aluminum roof and side covering, and a concrete floor was added. The contracts were performed during the years 1955 through 1958 and the total price of $3,880,000.00 was paid during said years. Contrary to the silt, sand and other soft material normally encountered and to be expected in the area, rock was encountered during the dredging. The presence of the rock was reported to the Dictator Trujillo and was shown to him at the work site and he ordered taxpayer to proceed and assured him he would be compensated. A million cubic yards of the two million cubic yards dredged consisted of rock. The going price in the Dominican Republic for dredging rock was $4.00 per cubic yard and the taxpayer made a claim for extra compensation. In April 1958, a month after the previous action covering the years 1951 to 1956 was brought, taxpayer testified in a deposition taken by plaintiff that he had sustained a loss of over $1,000,000.00 in the Boca Chica contracts, that they had not been completed nor liquidated, but the Commissioner in the two previous cases covering the years 1951 to 1956 and 1957 to 1958 (up to July 14) treated the contracts as completed and liquidated and determined that profits derived from the contracts were $\frac{1}{11}$ of the contract price of $3,880,000.00 and assessed a tax thereon which method as stated was accepted by taxpayer for the years involved. Taxpayer testified that with the settlement of his claim for dredging rock, he sustained a loss of over $1,000,000. The Commissioner determined that the entire payment of $1,552,000.00 in 1961 in settlement of taxpayer's claim represented profits derived from said contract. In his 1961 return tax-

payer did not report said payment of $1,552,000.00 as income.

(c) The expenses shown and claimed on his 1961 return in his operations for 1961 of $407,934.72 were disallowed by the Commissioner in his assessment as a result of which the losses shown and claimed in said return on the Yuna Contract were disallowed.

(d) Interest derived from bank accounts in The First National City Bank of New York of his said wife in the amount of $8,672.56. The parties have stipulated that taxpayer has a vested one-half interest in said interest and that $4,313.78 properly forms a part of his income for 1961.

(e) The amount of $216.00 as liability for self-employment tax.

(f) Normal deductions were allowed and made by the Commissioner including the amount of $25,000.00 as a reasonable exempt earned income allowance under Section 911 of the Internal Revenue Code.

(g) Fraud penalties were asserted and assessed under Section 6653(b) of the Internal Revenue Code of 1954, amounting to $709,794.65. Taxpayer claims the assessment of these penalties was unlawful.

(h) Plaintiff admits that it is bound by the judgments in the previous cases covering the years 1951 to 1956, both inclusive, and the years 1957 and 1958 (up to July 14), and that it was error on its part to assess taxes on the one-half vested interest of taxpayer's wife in any income derived from the said contracts with the Dominican Government.

The Dominican Republic for some 30 years prior to his assassination in May 1961 was ruled by the absolute Dictator Trujillo. There were no limits to the power he exercised, he was the government, he commanded everything, and could order extra work under government contracts. He and his family had an interest in every kind of business or enterprise in the country. (United States v. Rexach, D.C., 41 F.R.D. 180, footnote 1).

Taxpayer at the request or direction of the Dictator prepared plans and specifications, including the necessary engineering of harbor works projects which the Dictator wanted, drew up contracts for construction of the projects, and got the contracts but in order to obtain the contracts taxpayer had to pay or obligate himself to pay to the Dictator one-third of the total contract price, and this was the practice followed until the Yuna Contract was awarded in public bidding to taxpayer as the lowest bidder. Plaintiff admitted that these payments to the Dictator were ordinary business expenses in the Dominican Republic and were properly deductible from gross income as such under the Federal Internal Revenue Code until the effective date of the Technical Amendments Act of 1958 (26 U.S.C. 162, Trade or Business Expenses) Sections 5(b) and (c) of which read as follows:

"(b) The amendment made by subsection (a) (to subsections (c) and (d) of this section) shall apply only with respect to expenses paid and incurred after the date of the enactment of this Act (September 2, 1958). The determination as to whether any expense paid or incurred on or before the date of the enactment of this Act (September 2, 1958) shall be allowed as a deduction shall be made as if this section had not been enacted and without inference drawn from the fact that this section is not made applicable with respect to expenses paid or incurred on or before the date of the enactment of this Act (September 2, 1958)."

"(c) Improper payments to officials or employees of a foreign government. —No deduction shall be allowed under subsection (a) for any expenses paid or incurred if the payment thereof is made, directly or indirectly, to an official or employee of a foreign country, and if the making of the payment would be unlawful under the laws of the United States if such laws were

applicable to such payment and to such official or employee.'" (Pub.Law 85–866).

The obligation of taxpayer to pay to the Dictator one-third of the contract prices of the contract for construction of the Customs House Building and the contract for the construction of the Port of Azúa, described hereinabove, was incurred by taxpayer at the times he obtained the contracts, which in each case was prior to the effective date of Section 5(b) of the said Technical Amendments Act of 1958. At those times Dictator Trujillo was not an official of the Dominican Government, and not an employee of it; he was the Government. Taxpayer did not pay to the Dictator any part of the $1,552,000.00 paid to him in 1961 in settlement of his claim for rock dredging under the Boca Chica contract. A few days after the payment the Dictator was assassinated.

With the advent of the first of the previous suits against taxpayer in this Court, the Dictator was concerned that this practice we have described would become public knowledge. Agents of plaintiff were prohibited from inspection of taxpayer's papers and records in the Dominican Republic and the projects taxpayer had constructed or was constructing, although taxpayer had consented to such examination provided that the Dominican Government would permit it. It was the coercion of the Dictator that resulted in his denaturalization July 14, 1958, and only after the Dictator's assassination did taxpayer institute proceedings in which his denaturalization was held to be null and void ab initio.

Taxpayer performed other services for the Dictator and his government. He served as counsel to the Dictator's Army and Navy and as Commercial Attachè in France, and he did other jobs for the Dictator using his machinery and equipment and his ships to transport material. And taxpayer's aeroplane was kept in France available for use and used by the Dominican Diplomatic Mission in France (of which his wife was a member as Cultural Attaché) and available for use and used by the Dominican Ambassador and other Dominican officials. Taxpayer testified that

"Naturally when they needed a service from me they asked me and consequently as a question of good relations under the system under which I work I also tendered the services whether it was equipment or my personal services in any way whatsoever that the Government might need."

After the Azúa Contract taxpayer obtained no contracts other than that for construction of the Customs House for $700,000.00 and Contract No. 182 for $200,000.00, neither of which required any substantial use of his dredge and floating equipment until he obtained the Yuna Contract on public bidding in 1961. Some of the Trujillo family had formed a company called "Cocimar", acquired a dredge and established a drydock, and had obtained the important harbor construction contracts during that period. Taxpayer was not permitted to take his dredge and auxiliaries out of the Dominican Republic.

■ In his determination that taxpayer's profits on the payments received in 1959 on the Customs House Contract and on the Azúa Contract (see pars. (a) and (b), pp. 8 and 9 above) amounted to 57½% of said payments, the Commissioner, assuming that taxpayer paid to Trujillo 33⅓% of those payments, held that such payments were not deductible as business expenses, under Section 5(c) of the Technical Amendments Act of 1958, and treated this 33⅓% as if they constituted profits to taxpayer. In doing so the Commissioner erroneously applied the said law because the obligation of taxpayer to make payments to the Dictator were incurred prior to the effective date of that Act. Nor was any evidence presented as to whether these payments were made prior to or after the effective date of said Act. Moreover, the Dictator was not an official of the Dominican Government, and certainly not an employee during the years 1959 and 1961; he was the Dominican Government. And in determining that prof-

its on the Yuna Contract payment of $200,000.00 to taxpayer in 1961 were 57½% he assumed that 33⅓% of that amount was paid to the Dictator and disallowed that amount, although taxpayer did not have to pay or obligate himself to pay the Dictator 33⅓% of the price of said contract, and in his return for 1961 in which he listed his costs and expenses in the performance of the Yuna Contract until suspended, he does not include as an expense or cost any amount paid to the Dictator.

As to the remaining 24⅙% of the 57½%, the only evidence presented by plaintiff was the written report of Mr. H. K. Armstrong, a hydraulic engineer, and Construction Management Engineer, Department of the Army, Office of Chief of Engineers, admitted in evidence under a stipulation that if present as a witness he would testify as to the contents of said written report. He was in the Dominican Republic about three and a half weeks during the last part of April and the first of May 1965, at which time Mr. Richardson was in possession of taxpayer's properties as sequestrator. He made inspection visits to the jobs at Boca Chica, Azúa, Haina and Santo Domingo, but not to the Customs House nor the Yuna Contract. The only part of his conclusions as to estimated costs to the taxpayer which could possibly relate to the construction of the Customs House, the harbor at Azúa and the work on the Yuna Contract are paragraphs 20 and 21 of his report reading as follows:

"20. To develop a clear and concise presentation of the cost of work performed by Rexach for the Dominican Government is like unravelling a snarled and knotty ball of yarn. No particular pattern can be followed and information unearthed from here and there must be appraised for its value and used in a variety of methods of computation. As indicated herein, however, reliable cost estimates can be developed. In view of present knowledge of what to expect and with the experience of knowing where to look for source data, the task is not so difficult as it appeared at the onset. The conclusion is that revised estimates will support the fact that the aggregate cost of all work will not exceed 40 to 45 percent of the contract payments.

"21. Gross contract payments for work performed by Rexach for the Dominican Government during the period 1951 to 1958 total approximately 37 million dollars. A cost estimate for this work will range from 15 to 17 million dollars. It is estimated that the preparation of refined estimates covering this work, including investigations, engineering quantity computations, drafting, reproduction work, and the preparation of exhibits for court presentation will cost in the range of $10,000 to $15,000, exclusive of costs incurred for salary and expenses by the author and by a representative of the Internal Revenue Service in full time collaboration with the author. It is estimated that approximately six months would be required to obtain data, perform computations and to prepare exhibits for use in court."

Although there are no figures in his report as to costs of the work to taxpayer on these contracts, description of the projects, nor materials and supplies used, it is clear that Mr. Armstrong did not take into consideration the payments of 33⅓% of the contract prices to the Dictator (other than in the case of the Yuna Contract). Correcting his estimates that he thought would be shown by an appraisal, is tentative conclusions would be that on the whole the costs to taxpayer of the works constructed by him would be 73⅓ to 78⅓ percent of the total contract price. This is not an estimate of costs but rather what Mr. Armstrong thought such an estimate, if made by him, would show.

Mr. Armstrong's report also states that it was based

"on information and knowledge obtained as a result of investigations

conducted in the Dominican Republic including

"(1) Interviews with

(a) workmen,

(b) work supervisors,

(c) Material vendors,

(d) local engineers and contractors all of whom have some knowledge concerning the work.

"(2) Inspection visits to the jobs at Boca Chica, Azúa, Haina and Santo Domingo.

(3) Some limited physical examinations were made.

(4) Scope of work was observed.

(5) Quality of work and workmanship were observed."

He does not give the names of the persons whom he interviewed, the knowledge concerning the work that they had, what was done by him on the inspection visits to Azúa, what were the limits of the physical examinations, nor the scope of the work observed. His report is not adequate or sufficient to show what the costs to taxpayer of said projects were and the Court cannot find from it that the costs of the work on these projects (Customs House, Azúa and work on Yuna) were from 73⅓ to 78⅓ percent of the contract prices. Mr. Armstrong's report on Boca Chica, hereinafter to be mentioned, shows higher estimated costs. As to Yuna the evidence shows actual costs incurred by taxpayer.

Taxpayer, after his experience as to records of costs and payments under Dominican contracts instructed his bookkeeper to keep a complete record of the costs incurred in the work under the Yuna Contract, and from a check voucher journal, it appears that these costs were not less than $408,934.72 not including depreciation, and engineering, which less the $200,000.00 payment on account of the contract price, resulted in a loss of $208,934.72. At the time of the suspension of this contract, taxpayer had dredged 1,133,000 cubic yards of material as shown in the log book of the dredge and the Dominican Department of Public Works figures that $800,000.00 was due taxpayer for the work done. This amount is substantially less than taxpayer's claim, but since 1961, he has been unable to get any payment from the Dominican Government in spite of his efforts. At taxpayer's estimated cost of 40¢ per cubic yard for dredging, total costs of dredging would be $453,200.00 which with $50,000.00 shown to have been paid for materials and spare parts purchased in continental United States, would increase total costs to $503,200.00. This figure does not include depreciation, supplies, spares and materials used which were on hand at the time he commenced work, nor engineering costs nor those of marshalling his equipment at the work site, some 200 miles distant from Santo Domingo. To marshal his equipment at the work site the dredge had to be prepared to make it seaworthy by boarding it up with steel plates and towed some 200 miles to Samaná Bay during which trip it had to be held up for several days at Catalina Island (about 100 miles from Santo Domingo) waiting for favorable weather before crossing to Samaná Bay. The work area was isolated and fuel, supplies, food and water had to be transported there; floating equipment such as tugs, lighters, floating derricks, bulldozers and other equipment had to be marshalled at the work site; insurance on the dredge had to be purchased; and logs from the mouth of the Yuna River had to be cleared out and other work done preliminary to beginning of dredging. To house his workmen taxpayer built a floating hotel the construction of which cost $90,000.00. Taxpayer estimated that he had incurred in costs amounting to some $1,000,000.00 with respect to the Yuna Contract.

Plaintiff produced no evidence that profits from the Yuna Contract

were 57½% of the $200,000.00 payment received on account of the contract in 1961. And taxpayer never agreed or stipulated that the method used by the Commissioner to determine profits from Dominican contracts employed by him in previous years could be valid in 1961. Such a method would manifestly be unreasonable and not calculated to show net income of taxpayer. Since the amount of the minimum actual costs incurred by taxpayer in performing the Yuna Contract, and the amount received as payment on account of the contract price in 1961 are known, and since the contract was begun and suspended in that year, there is no need to use any formula for determination of profits or loss. The actual work performed under that contract is such as to compel the conclusion that the costs thereof substantially exceeded $200,000.00, and the assessment by the Commissioner of a profit of 57½% of the $200,000.00 was arbitrary and without any reasonable basis since the minimum costs figures and amount received on account were shown in taxpayer's 1961 return. It does not appear that the Commissioner or his agents made any investigation or discussed the matter with taxpayer prior to making the said assessment. It is highly doubtful, moreover, that a profit of 57½% of the contract price is ever earned on such a contract as the taxpayer testified.

It is elementary that in a suit to collect taxes the Government occupies the status of a private litigant and the burden of proof is upon it. It is true that a prima facie case is established by proof that the tax liability has been assessed and that the taxpayer defendant must go forward to sustain his defense. This burden to go forward is procedural and is met if the taxpayer produces competent and relevant evidence from which can be found that he did not receive the income alleged in the deficiency. When this burden to go forward is met, the burden of proof shifts back to the Commissioner to prove the existence and amount of the deficiency. (Foster v. Commissioner of Internal Revenue, 4 Cir., 391 F.2d 727, 735). And the determination of the Commissioner is not evidence to be weighed against that produced by the taxpayer. (Lawrence v. Commissioner of Internal Revenue, 9 Cir., 143 F.2d 456). As to fraud the Government has the burden of proof at all stages of the proceedings (26 U.S.C. § 7454). As to the assessment of 57½% of the contract prices allocated to or received in the years 1959 and 1961 from the Customs House, Azúa and Yuna Contracts, taxpayer met the burden of going forward, and the Commissioner has failed to sustain the burden of proof as to the existence and amount of these items of the deficiency. On the contrary the deficiency is based on a mistake of law (see 9 Law of Federal Income Taxation, Mertens, Sec. 50.65, p. 187) and the report of Mr. Armstrong as to what an estimate of costs when made might show. There have been no changes in the circumstances and applicable law since 1951 to justify the Commissioner in determining profits on the Customs House and Azúa Contracts to be 57½% of the allocable contract prices instead of ¹/₁₁ of such contract prices as previously made by him, and in doing so the Commissioner has not been consistent. We think the Commissioner is equitably estopped from making this change, (see 10 Law of Federal Income Taxation, Mertens, Sec. 60.-21, p. 96; Thomas v. Commissioner of Internal Revenue, 5 Cir., 324 F.2d 798; Tait v. Western Maryland R.R. Co., 289 U.S. 620, 53 S.Ct. 706, 707, 77 L.Ed. 1405), and that the doctrine of quasi estoppel also precludes him from making such a change (10 Law of Federal Income Taxation, Mertens, Sec. 6.04, pp. 14–15; Orange Securities Corp. v. Commissioner of Internal Revenue, 5 Cir., 131 F.2d 662).

It follows from what we have said that the disallowance of the loss of $208,934.-72, reported in taxpayer's 1961 return, by the Commissioner in his said deficiency assessment was erroneous.

The funds previously advanced by taxpayer to Escambrón Development Company were treated by the Commissioner as capital contributions, no note or notes having been given by the corporation therefor, and no interest having been charged therefor, and taxpayer and his said wife owned all of the outstanding stock of the corporation. The corporation's records were examined by Mr. Lyden, and depreciation claimed by the company was reduced to conform to Internal Revenue Service depreciation guidelines set forth in Bulletin F, which reduction resulted in sufficient earnings and profits so as to constitute the $33,927.22 payment made to the taxpayer in 1959 taxable dividends. The corporation owned and operated a hotel in Puerto Rico and its income was not subject to Federal Income Tax, and the rates of depreciation which it used were rates customarily used in Puerto Rico for hotels. Its income tax returns had been inspected by the Commonwealth Government and no objection to the said rates had been made. In a previous inspection by a Federal Internal Revenue Agent no objection was made to the use of said rates, nor to payments on account of the indebtedness to taxpayer.

As stated by plaintiff in its brief

"In determining the taxable status of a distribution received from a foreign corporation, the latter's earnings or profits are to be ascertained in accordance with the same principles applicable to a domestic corporation without regard to standards prescribed by a foreign law for computing income or earnings or profits." 1 Merten's, Law of Federal Income Taxation, Section 9.37.

From the application of this principal it follows that the payments of $33,927.22 by Escambrón Development Company to taxpayer in 1959 constituted constructive dividends, and this total amount was correctly assessed against taxpayer as income, since under Puerto Rican law the wife does not have a vested interest in income received by her husband.

As to the amounts allowed by the Commissioner as reasonable exempt earned income tax allowances ($50,000.00 in the assessment for 1959 and $25,000.-00 in the assessment for 1961) under Section 911 of the Internal Revenue Code of 1954, taxpayer failed to present any evidence or to cite any provision of law that would overcome the presumption of the correctness as to the amount of these allowances and the Court holds them to be correct. Nor did taxpayer present any evidence or cite any provision of law that would destroy the presumption of correctness of the assessment of $216.00 as liability for self-employment tax in each of the years 1959 and 1961.

As conceded by plaintiff the inclusion in the deficiency assessment for 1959 of profits on Contract No. 182 executed July 24, 1958 and published in the official Gaceta No. 8278, was erroneous; and as conceded by plaintiff the assessment of the tax against taxpayer on the total amount of the income was erroneous, and the one-half vested interest of his wife in the Dominican income must be excluded. And as agreed to and stipulated by the parties, only one-half of the interest on his wife's bank account with The First National City Bank, amounting to $4,313.78 may be included in the 1961 assessment, and the other half amounting to $4,313.78 erroneously included by the Commissioner must be excluded.

Taxpayer sustained substantial losses in the performance of the contract and supplement thereto for construction of the harbor and facilities of the Port of Boca Chica and the payment he received in 1961 from the Dominican Government in settlement of his claim for dredging rock was not sufficient to cover his said losses. Although taxpayer had informed plaintiff that he had sustained losses of over a million dollars and that the contract had not been liquidated (i. e. paid

in full) plaintiff nevertheless treated it as completed and paid for and insisted on the application of the formula used by him in the assessments for the years 1951 to 1956, both inclusive, and the years 1957 and 1958 (up to July 14) for determining net profits on the contract price, to which taxpayer agreed by stipulation which provided that such formula was to be applied to those years only. The showing of his losses was not therefore relevant at that time. Moreover, taxpayer could not show those losses at that time without the risk of confiscation of his Dominican properties and probably risk of bodily harm, since it would have involved revealing the payments of $33\frac{1}{3}\%$ of the contract price to Dictator Trujillo. Taxpayer had some 84 men working at Boca Chica with the dredging of the rock and his dredge was in operation there some two years instead of six months as anticipated. The cost of operation of the dredge not including parts and repairs and depreciation was $180,000 to $200,000 per month. Due to time consumed in making repairs it was engaged in actual dredging 15 to 20 days per month and at times daily production was not more than 100 cubic yards. After the job was completed the dredge had to be put in drydock, there were cracks in its bottom and a new main pump had to be installed. Some 12 spuds were broken each of which cost $25,000, and 5 or 6 manganese cutter shafts were used, each costing $7,000.00. During the work at Boca Chica taxpayer's dredge was damaged by sabotage in the amount of $50,000.00.

Upon completion of the project the work was inspected by the Dominican Government and accepted and he was paid for dredging 2,000,000 cubic yards of material, although taxpayer said he dredged more than that, and the Dominican Department of Public Works found that of the 2,000,000 cubic yards dredged, 1,000,000 cubic yards of the material was rock.

In paragraph 10 of his report on the estimated cost to taxpayer of the Boca Chica project Mr. Armstrong states:

"10. Dredging operations at Boca Chica turned out to be more difficult than the expectations of the contractor. The material was not sand and silt as normally encountered when dredging sedimentary deposits in river channels and in harbor areas. Materials were sand and coral rock formations, the latter of varying degrees of density and hardness. Answer to Question No. 176 reports 75 percent solid rock and the remaining 25 percent sand. Solid rock requires drilling and blasting to loosen it before it can be handled by a cutter head dredge. No drilling and blasting were done in connection with the dredging at Boca Chica. It is acknowledged that material was difficult to loosen with the cutter. As large chunks of coral formations were broken free by the cutter action and drawn into the pump, clogging of the pump impeller resulted, requiring numerous shut-downs for the purpose of rock removal and cleaning of the pump. Due to the hard and firm texture of the material in place, and to the difficulty in loosening the material with the cutter, plant production was considerably below normal expectations."

And he also said that the dredging operations were three times more difficult because of the rock. In that report, however, Mr. Armstrong assumes, (subject to verification, as he says) that only 1,-650,000 cubic yards of material was dredged, and he assumes (subject to verification, as he says) that the dredge was in operation there only 668 days instead of 730 days (i .e. two years); and it does not appear from his report that he knew the quantity of rock that was dredged. Mr. Armstrong was not present, of course, at the time of the dredging operations, and he did not interview the dredge Captain nor its Chief Engineer nor its Chief Welder, all of whom were in San Juan or the Dominican Re-

public at the time Mr. Armstrong was there, nor taxpayer.

Mr. Armstrong did not include in his costs the 33⅓% paid to the Dictator, and his unit labor costs shown in the report were based on lower salaries and wages than those paid by taxpayer. Other known expenses such as the Christmas bonus tax were not included.

If Mr. Armstrong's report of estimated costs of dredging be adjusted by using the 2,000,000 cubic yards dredged instead of 1,650,000 cubic yards, of which 1,000,000 cubic yards was rock, by taking the actual time the dredge was in operation and by including as costs the 33⅓% paid to the Dictator, a loss of some $510,000.00 will be shown in the dredging. And if his report on the cost of the other work at Boca Chica be adjusted by including as costs the 33⅓% paid to the Dictator, it would show a profit of $375,667.00. This would then result in an overall loss of some $134,333.00.

Yet in the other cases taxpayer accepted the Commissioner's method by which he determined approximately $338,000.00 as profits, and was taxed on one-half that amount plus interest which he paid.

While the report of estimated costs by Mr. Armstrong on the Boca Chica project confirms the taxpayer's showing of a loss, it is not adequate to show actual costs. It is an opinion of what an estimate of costs by him would show if made.

The report includes nothing for cost of engineering and design of the project which was furnished by taxpayer, it fails to reveal the names and identity of the persons interviewed and their knowledge of the work, nor of the suppliers nor invoices consulted, and other details required for an evaluation of his opinion. It is not, and was not a final estimate of costs for the preparation of which substantial further study, tests and verifications would be required.

Mr. Armstrong implied that dynamite should have been used to loosen the rock, suggesting that the cost of removal would have been less. Taxpayer stated the reasons why dynamite could not be used, including his statement that he would not touch a stick of dynamite in the Dominican Republic. The costs that are relevant are those incurred by tax-payer, not costs that another contracting engineer might have incurred in some other place.

Mr. Armstrong was not a contracting engineer and had performed no harbor works in the Dominican Republic. Taxpayer would be the most competent person to testify as to the costs of the Boca Chica project since he designed it, constructed it with his organization and equipment and paid the costs, and is one of the leading harbor works engineers with some fifty years of experience of which twenty-seven relate to work in the Dominican Republic. He was an interested witness but the Court finds nothing in his extensive testimony as to the Boca Chica project which suggests that its probity is affected by the interest of the witness. It establishes that taxpayer sustained a substantial loss on the Boca Chica contract and that his costs in performing the contract and supplemental contract were substantially in excess of the contract prices including the $1,552,000.00 that he received in 1961 in settlement of his claim.

Profits from the contracts, which in fact he did not receive, were determined in the previous cases by the Commissioner on the theory that the contract had been completed and paid in full although taxpayer informed the plaintiff in April of 1958, immediately following the filing of the action embracing the years 1951 to 1956, both inclusive, that the contract had not been completed and liquidated and that he sustained a loss in its performance in excess of $1,000,000.00. At that time and at the time of the second action covering the years 1957 and 1958 (up to July 14) he had no alterna-

tive but to accept the Commissioner's method of determining profits. Under interrogations by attorney for plaintiff, taxpayer repeatedly testified in complete detail as to the performance of the contract and its supplement, and after the Dictator's assassination he testified as to the substantial cost of $33\frac{1}{3}\%$ of the contract prices paid to the Dictator to obtain the contracts. Plaintiff called taxpayer as a witness for these interrogations, referring to him as a hostile witness. But the Court finds nothing in this testimony to indicate that his interest affected the truthfulness of his statements. He stated that he had nothing to hide, and made available to plaintiff and its agents all of his papers, records and his information as to the design and construction of the project. His testimony cannot be disregarded merely because he is an interested party. Moreover, the conditions he encountered in the work that caused his loss are confirmed by the report of Mr. Armstrong and his opinion as to what a cost estimate would show when adjusted to the facts as to the quantity dredged (determined by the Dominican Department of Public Works), the admitted payment of $33\frac{1}{3}\%$ of the contract prices to the Dictator and the actual time of operation of the dredge also shows a loss. This loss was increased by the tax on the profits previously determined by the Commissioner which in fact he did not earn.

■ It would be manifestly unjust and not in accordance with law, to now assess a federal income tax on any part of the said payment he received in 1961 as net income, and the Commissioner's assessment of this payment as profits and its inclusions in the 1961 deficiency is erroneous.

In December 1966, after the trial of this case before the late Judge Clemente Ruiz Nazario, those of his Dominican papers and records that were extant were returned to him. The $9,000,000 suit against taxpayer in which the properties had been attached was never tried,

the Dominican Government having realized that it had no cause of action. And the sequestration was ended by Court order but no accounting was ever rendered by the Sequestrator, and no costs were awarded to taxpayer. While at the time of seizure the properties were in first class operating condition, upon their return they were damaged, in disrepair, some had been sold or otherwise disposed of and others abandoned and rendered useless. A series of photographs made at the time of return show the damaged condition of a number of the principal items. Taxpayer estimated that the damage and loss amounted to approximately $1,000,000.00 and that it would take about six months to put the dredge in repair. The Dominican Government has never paid taxpayer any damages for his loss nor put the properties in the condition they were at the time of seizure. Although during the sequestration the properties were used as if the Dominican Government owned them, taxpayer has never been paid or otherwise compensated for such use.

After seizure his records and papers were taken from his office (destroyed by fire) and put in one of his cottages near the graving dock where they were permitted to be examined by an agent of the Commissioner during the time Antonio Casals Piñeyro was the Sequestrator, and later they were put in a shed at the graving dock. Taxpayer does not know whether all of his papers and records were returned, although after their return he tried without success to find documents relating to the Yuna Contract.

■ While losses to an individual United States citizen or resident alien sustained by reason of seizure by the Government of Cuba are deductible as capital losses over a period of years pursuant to 26 U.S.C. § 165, that provision of law is not applicable to damages or loss resulting from seizure by the Dominican Republic. Only Congress can prescribe the deductions allowable and while the present law may be discrim-

inatory, such discrimination does not affect the constitutional validity of the existing law.

■ The loss in 1962 of the floating hotel through dismantling and theft of the materials of which constructed and the equipment installed therein constitutes a loss in 1962 and deductible under 26 U.S.C. § 165(a) and (e). While theft includes embezzlement seizure has been held not to be a loss by theft. (See 5 Law of Federal Income Taxation, Mertens, Sec. 28.59, pp. 269 et seq.). Losses from shipwreck are also deductible (26 U.S.C. § 165), but taxpayer failed to show the losses to the two tugs, barge and floating derrick that were sunk.

■ While the evidence does not show the amount of annual depreciation of taxpayer's Dominican properties used in his Dominican business it does show that annual depreciation on his graving dock and the major items of his floating equipment such as the dredge and ships to be $130,338.00 calculated in accordance with the guidelines of Bulletin F. His tax return for 1960 shows no income and the deficiency assessed thereon was $53.-91 which was not contested but is not sought to be recovered in this action. His return for 1961 does not show depreciation of said items for that year. His returns for 1962, 1963 likewise show no income and there was no income in 1964. Annual depreciation for those years 1960, 1962, 1963 establish losses for those years and annual depreciation on those items for 1961 increase his loss for that year. These resulting losses are operating losses and are not only deductible in the year in which incurred but may be carried back two years and deducted and carried forward five years and deducted from gross income as provided in 26 U.S.C. § 172. They cannot however, be used to offset the amount of self-employment tax due.

■ No judgment may be obtained from a Dominican court against the Dominican Government without its consent and any recovery on taxpayer's claims for suspension of the Yuna Contract and losses from the seizure that he may ultimately obtain will have to be obtained by diplomatic proceedings. Taxpayer thus far has been able to recover nothing although the United States Department of State has been assisting him in his efforts. Taxpayer testified also that the Dominican Government has no funds with which to pay his claims. No bond was posted by the Sequestrator and taxpayer has no effective remedy to obtain an accounting.

After the return of his properties taxpayer made available to plaintiff in the Dominican Republic all of his papers and records returned to him, and plaintiff's agents examined them during a day and a half in October and again December 6 and 7, 1967, but they did not take the time necessary to make a thorough examination. Some of the papers and records were selected at random by the agents, taken by them and brought to Puerto Rico, with taxpayer's consent, to be examined in detail. The agents were looking primarily for evidence of the receipt by taxpayer of unreported income in 1959 and 1961; they were not making an audit, could not and did not prepare a profit and loss statement. Mr. Fontaine, one of the agents, testified that he was not looking for costs and expenses and that

> "If income is not reported on the income tax return, any expense attributable to that income cannot be deducted. At that time I was shown this gross income (not, sic) submitted on the return. Any expenses attributable to income not shown on a return is not deductible, sir."

and that

> "There was one schedule that I prepared originally showing expenses of the ships, but inasmuch as I wasn't sure that all of the income of the ship was reported, and the expense was directly allocated to that specific ship, I dropped it all."

The records did show gross income in 1959 and 1961 from work done at the graving dock on ships other than those of taxpayer and from freight collected for cargo carried for others on his ships "Rio Haina" and "Puerto Trujillo". Some minor costs and expenses of this work and the ships appeared in the records but no attempt was made to find all of the costs and expenses by said agents.

Taxpayer testified that he was not engaged in the business of carrier, and the ships were used in some instances to carry cargo in order to decrease the loss from maintenance of them and their crews during periods in which they otherwise would have been idle, and that he derived no net income from them. In one instance the evidence showed that the cost of operating the ship on voyages to Curacao were in excess of the freight recovered.

At the time of filing his federal returns for 1958 (amended), 1959, 1960 and 1961 his papers and records had been seized and he had no access to them which was stated in the letters attached to his returns, and so were all of his Dominican properties. It was said that taxpayer should have filed amended returns, but before he got his properties, papers and records back in 1966 the jeopardy assessment for 1959 and 1961 had been made, and this action brought and tried before the late Judge Ruiz Nazario.

This evidence as to receipt of gross income in 1959 and 1961 shown by the papers and records taken by plaintiff was admitted under the stipulation of the parties submitting the case for decision, and was for the purpose of sustaining the Commissioner's assertion and assessment of fraud penalties, and as counsel for plaintiff stated, for offsetting taxpayer's losses.

 The Internal Revenue Code (26 U.S.C. § 6653(b)) provides that if any part of any underpayment of income taxes is due to fraud there shall be added to the tax an amount equal to 50 percentum of the underpayment. Fraud as the term employed in the statute is used means an actual and intentional wrongdoing and the intent required is one of a specific purpose to evade a tax believed to be owing (Cefalu v. Commissioner of Internal Revenue, 5 Cir., 276 F.2d 122); and the burden of proving fraud is and remains on the plaintiff throughout the proceedings, and there can of course be no penalty of fraud without a tax deficiency (10 Law of Federal Income Taxation, Mertens, Sec. 55.10, p. 47). Since only net income is taxable, the showing of unreported gross income has been held to be insufficient to sustain the fraud penalty without evidence that taxpayer realized gain from such gross income. The fraud penalties asserted by the Commissioner in his assessment for 1959 and 1961 was not bottomed on the unreported gross income shown by that portion of taxpayer's papers and records taken by plaintiff's agents.

As to the constructive dividend which we have held to have been received in 1959, there was no intention of the taxpayer to evade a tax believed to be owing. There was no constructive dividend under Puerto Rican practice and law, public accountants retained by plaintiff were of the opinion that there was no constructive dividends, and previous payments of the same kind had been made to taxpayer without objection from the Commissioner even after audit of the records and accounts by the Commissioner's agents.

Nor does the evidence show that plaintiff had any notice or information at the time of making his 1961 return that his wife had received or been given credit for the interest on her Bank account. Although taxpayer stipulated that he had a one-half vested interest in said interest, it is questionable that he did have such share under the law of New York where the marital community institution does not prevail, the state in which the interest was earned.

Plaintiff has not met the burden of proof required, and the assertion and assessment of the fraud penalties for 1959 and 1961 were and are contrary to the statute and cannot be included in the deficiency.

As stipulated by the parties and as heretofore held by this Court, taxpayer will be entitled to a tax credit against any Gross Receipts Tax paid under Dominican law on the income from his Dominican operations as provided by the Internal Revenue Code.

The parties are directed to draft and submit proposed findings of fact and conclusions of law, including computations of any amount of taxes held to be properly assessed under the deficiencies assessed for 1959 and 1961 under the holdings of this opinion, for approval by the Court and the parties are granted a term of thirty days therefor from the date of this opinion.