Maria Elisa RODRIGUEZ, Buenaventura Rivera, Carmen Elisa Rivera, Jose Rafael Rivera, Miguel Antonio Rivera, Lydia E. Rivera, Jose Ramon Rivera, Ramon Jose Rivera, Plaintiffs,

v.

ESCAMBRON DEVELOPMENT CORP. and/or the Successors of Félix Benítez Rexach; René Benítez Rexach, Félix Benítez Rexach, Jr., Gilberto Benítez Rexach and Haydee Benítez Rexach, Defendants,

v.

UNITED STATES of America, Intervenor.

Civ. No. 78–2526CC.

United States District Court, D. Puerto Rico.

Feb. 10, 1983.

---

**7.** Because of this ruling, we need not consider plaintiff's motion for preliminary injunction.

D. Rivé-Rivera, Calderon, Rosa-Silva & Vargas, Hato Rey, P.R., for plaintiffs.

Raymond L. Acosta, U.S. Atty., Hato Rey, P.R., for intervenor.

Pedro Morell-Corrada, Río Piedras, P.R., for defendant Gilberto Benítez-Rexach.

## OPINION AND ORDER

CEREZO, District Judge.

This case originated in the Superior Court of Puerto Rico, Bayamón Part, with the filing of a relatively simple and brief complaint against Escambrón Development Corp., sole defendant at that time, in which plaintiffs sought judicial declaration of their right of ownership by means of extraordinary prescription or uninterrupted adverse possession exceeding thirty years over a farm of 9.897 "cuerdas" which physically formed part of a bigger 42 "cuerdas" farm recorded in the Registry of Property as owned by the corporate defendant. Shortly thereafter the United States of America filed a motion seeking intervention asserting that it was a necessary party in the litigation for it held liens against the property object of the dominion proceedings. In its memorandum the government urged that a judgment upholding the extraordinary prescription claim would adversely affect its opportunity to collect certain liens arising from taxes owed even if plaintiffs received a title subject to such liens and that under the laws of Puerto Rico a creditor may protect his liens over real property involved in litigation without having to resort to another lawsuit. Intervenor's claim is based on taxes owed by taxpayers Félix Benítez Rexach and his wife Lucienne D'Hotelle which they had refused to pay after demand. The complaint sets forth the amounts assessed against them and the fact that action had been previously filed in federal court to foreclose these liens. The right of the United States to intervene in this action has never been disputed.

The case eventually found its way to this court upon the government's petition for removal. Plaintiffs subsequently filed their answer to intervenor's complaint denying for lack of information the fundamental allegations. This denial was based on the fact that the action for foreclosure of federal tax liens, Civil 67–64, *United States v. Félix Benítez Rexach, et al.,* had not been completely investigated by their attorneys. On January 29, 1979 plaintiffs tendered an amended complaint adding the members of the estate of Félix Benítez Rexach as defendants.[1] Their inclusion is not entirely clear since the amended pleading states that the property claimed forms part of a farm recorded in the Registry of Property of Bayamón, Puerto Rico on behalf of Escambrón Development Corp. and/or Lucienne D'Hotelle as owners. No mention of

---

1. Several members of the estate of Benítez Rexach answered the amended complaint alleging that plaintiffs never possessed the land during the statutory period required for extraordinary prescription and that coplaintiff Rivera Mulet merely possessed it as an employee of defendant.

Benítez Rexach as owner is made in the amended complaint. This has become irrelevant since after the death of Lucienne D'Hotelle her husband became sole owner of the property.

Aside from the limited discovery conducted, the development of this case has focused almost exclusively on the filing of several motions for summary judgment by the plaintiffs and the intervenor. The government's position has always been that plaintiffs' claim of ownership was inchoate before the year 1963, date of assessment of the taxes owed by the Benítez Rexachs, owners of the property. Thus, it asserts that its liens are prior and superior to any ownership claim of plaintiffs. The government has also contended that any local statutory provisions that would fix the perfection of plaintiffs' ownership claim prior to the completion of the prescribed thirty-year term must be ignored. The latter contention was meant to rebut the 'relate-back' doctrine advanced by plaintiffs. Their arguments in opposition to the government's summary judgment motion have been reproduced as grounds for their own motion. The basis of plaintiffs' various motions for summary judgment, the first of which was filed on February 15, 1980, as well as of their oppositions to the government's motions, rests on the allegedly uncontroverted fact that Mr. Félix Benítez Rexach donated the land in dispute to them and that they have possessed the same publicly and without interruption for the last thirty years, specifically since 1945, as owners. They claim that the government's tax liens reach only the delinquent taxpayers' property and that, since they had acquired title over the nine "cuerdas" from the taxpayers because prescription ran against them, that tract of land was no longer the property of the prior owner—the government's debtors. Plaintiffs contend that under *Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960) the property interests of the taxpayers must be defined and ascertained under state law. Since under the doctrine recognized by state law once extraordinary prescription is established, the prior owners are divested of title and, they

claim, those who acquire through such means do so free of any liens imposed over the property during the development of the prescription period, their title to the land is clear and unencumbered. The government has consistently held that its tax liens prime plaintiffs' claim and that in any event, if it were ultimately determined that plaintiffs did in fact acquire through extraordinary prescription, they did so subject to the tax liens assessed against the delinquent taxpayers Benítez Rexach and Lucienne D'Hotelle, prior owners. The motions for summary judgment filed by both parties were twice denied. As to plaintiffs' motions, we ruled that their claim of ownership over the land was a matter as to which there was substantial controversy which required adjudication in a plenary hearing and not by summary disposition. Despite these rulings, the parties filed yet another set of motions for summary judgment based on the same legal arguments set forth above. The Court is fully aware that plaintiffs must first prove their ownership right before they can even call into question the consequences or effects of ownership by means of extraordinary prescription. It would seem fruitless to pass upon the effects of ownership when the validity of their title has not yet been established. Although we would ordinarily require plaintiffs to establish their claim of ownership via extraordinary prescription over the property before even considering the alleged favorable effects resulting from this particular manner of acquisition, our reluctance in doing otherwise has been set aside due to the fact that both parties have made the question of whether the property was obtained subject to or free from the tax liens a major issue in this case. We make clear, however, that our decision to pass upon this important legal issue does not in any manner relieve plaintiffs of their burden of proving ownership, something they have yet to do, as shall be discussed in the final part of this opinion. Our decision to rule now on the question of whether they acquired the property subject to or free from the government's liens before estab-

lishing the fact of ownership itself responds to the belief that a preliminary ruling on this issue will materially advance the termination of this lawsuit since it is questionable that plaintiffs will pursue their ownership claim if an adverse ruling on the *effects* of extraordinary prescription ultimately prevails.

It is convenient at this time to outline those facts which are not in dispute in this action, to wit: that taxpayers Félix Benítez Rexach and his wife Lucienne D'Hotelle owed the federal government taxes exceeding the sum of $4,000,000.00 which have been foreclosed in two actions filed before this court, Civil 67–64 and Civil 531–64; that these debts were owed and not paid; that said liens attached against the several properties belonging to them among which is the farm involved in this litigation and that these liens have been found to be valid by judgments entered in these two cases. The purpose of Civil 67–64 filed against the coexecutors of the Estate of Félix Benítez Rexach was to foreclose tax liens which secured debts of delinquent taxpayers Félix Benítez Rexach and his wife which encumbered certain properties of the debtors, including the farm located in Bayamón, Puerto Rico which is the object of this litigation. These tax liens arose on December 18, 1963, date of their assessment. The Bayamón property claimed by plaintiffs in this case was found by the court in Civil 67–64 to be the community property of Mr. Benítez Rexach and his wife Lucienne. In that action the Court determined that the government's debtors were liable for income taxes for the years 1959 and 1961 in the total sum of $2,622,127.31, plus interest, and further found that the tax debts arose from community income earned in 1959 and 1961. In that same action, it was determined that, although the Bayamón property claimed by plaintiffs was recorded on behalf of Lucienne D'Hotelle as owner, upon her death in 1968 her spouse acquired all of her estate thus subjecting that farm to the federal tax liens arising from the tax debts incurred in the years 1959 and 1961. On February 24, 1964, at an early stage of the development of Civil 67–64, the United States filed a notice of *lis pendens* giving notice to all of the pendency of the suit in which it sought to foreclose federal tax liens in the sum mentioned against the Bayamón farm recorded in the Registry of Property of Bayamón, Puerto Rico, a part of which is claimed by plaintiffs in this action. In addition to Civil 67–64, another action was filed by the United States against Mr. Benítez Rexach and his wife Lucienne to enforce their tax liability for federal income taxes corresponding to the years 1944 through 1952. In this second lawsuit, Civil 531–64, the Court entered judgment on October 20, 1975 adjudging the estate of Lucienne liable to the United States for the taxes owed for those years and further adjudging Mr. Benítez Rexach liable for Lucienne's taxes as administrator of the community and because of his tortious conversion of the federal tax liens encumbering her property and as a transferee of his wife's property which was subject to those tax liens. On February 27, 1978, the government requested foreclosure of its tax liens in Civil 531–64 and on March 27 of that year foreclosure of said liens was ordered against properties of Félix Benítez Rexach which liens secured his tax liability to the government for his wife's community liability in the amount of $1,773,087.59 for federal income taxes for the years 1944 through May 20, 1952, inclusive.

Plaintiffs' memorandum of law filed in this case on July 30, 1980 contains the arguments which they have repeatedly raised throughout these proceedings in support of their various motions for summary judgment. Their main argument is that the property described in the complaint ceased to belong to delinquent taxpayers Benítez Rexach and Lucienne prior to the notice of the federal tax liens since they had been divested of ownership as a result of plaintiffs' adverse possession as owners without interruption for over thirty years and that the debtors' loss of property relates back to the beginning of plaintiffs' adverse possession since extraordinary prescription, once perfected, has retroactive effect to the moment of the first act of possession. As a

corollary of this theory plaintiffs adduce that since extraordinary prescription has retroactive effect, as recognized by civil law, they have been owners of the land since the year 1945 and, furthermore, that the extraordinary prescription cleared their title, so acquired, of all liens which encumbered the property during the course of the prescription process. Accordingly, they urge that, having acquired title over the land free of all liens, they are not responsible for, nor is the land encumbered by, the tax liability of the prior owners Benítez Rexach and Lucienne D'Hotelle.

In order to better understand the underlying factual situation, it should be noted that the tax liens in favor of the United States attached upon the entire Bayamón property composed of 42 "cuerdas". As stated before the nine "cuerdas" claimed by plaintiffs form a part of the bigger farm. It should also be noted that the provision of the Civil Code of Puerto Rico which establishes extraordinary prescription as a mode of acquiring domain or title over real property, 31 LPRA Sec. 5280, does not in itself grant retroactive effect to such manner of acquisition, nor does it anywhere provide that a property so acquired is deemed to be free of any and all liens which have attached over it during the thirty-year period of prescription.

The Court is cognizant of the holding in *Aquilino, supra,* which states that the property interests of a taxpayer against whom federal tax liens have been imposed must be ascertained pursuant to state law principles. In harmony with that decision, this Court will apply Puerto Rican law and its definition of the taxpayers' property interests in determining whether their property was in fact transferred to plaintiffs through extraordinary prescription. In doing so, we would be bound to determine whether, in accordance with the established principles of the Civil Code of Puerto Rico concerning extraordinary prescription, plaintiffs possessed the Bayamón property of Benítez Rexach and Lucienne D'Hotelle, as owners

and without interruption for a period of thirty years. This would lead to the conclusion, were plaintiffs to prove that extraordinary prescription ran in their favor, that as of 1975 plaintiffs became owners of the land which was allegedly abandoned by its owners for thirty years. However, under 26 U.S.C. Sec. 6322 the federal tax liens which arose at the time of their assessment (1963) continued until the amounts assessed were satisfied and transfer of the property subsequent to assessment of these liens would not affect it. Nonetheless, plaintiffs contend that, since civil law doctrine recognizes retroactive effect to acquisition by means of extraordinary prescription, they must be deemed to be owners since 1945 and, more importantly, that in accordance also with civil law doctrine, they acquired title since that time free of all liens which encumbered the property during the running of the thirty-year period of their adverse possession. Thus, they do not merely request that we apply state law to define their property interests and those of the tax debtors whom they allegedly divested of title, but also that we apply the civil law doctrine relevant to the effects attached to the particular mode of acquisition: extraordinary prescription.[2] Such is the reading they give to *Aquilino v. United States.*

The application of state law to ascertain the effects of acquisition by extraordinary prescription is not based on Puerto Rican law but rather on the opinion of Spanish civil law commentator Castán and of Planiol and Ripert and Colin and Capitant on French law. The two authors of treatises on French law, however, are cited only in support of their theory of retroactive effect. The only civil law scholar cited by them in support of their theory that the effect of extraordinary prescription is to liberate property so acquired of all liens is Spanish commentator José Castán Tobeñas (Castán). They have quoted the Castán treatise, *Derecho Civil Español, Común y Foral,* II, Vol. I, 1971 edition, at page 369, where it is stated that as a consequence of

**2.** Plaintiffs have at all times claimed ownership via extraordinary prescription, not by way of

ordinary prescription which requires just title and good faith possession.

the retroactivity of prescription the adverse possessor, upon termination of the period of prescription, acquires the property free of all liens which may have been imposed during the development of the prescription period. The matter, however, is not as simple or as clear-cut as plaintiffs would have us believe. At pages 367 and 368 of that same treatise, Castán, in his discussion of the effects of prescription and its consequences on liens which encumber the property, refers to what is known as *usucapio libertatis.* He states that it is common doctrine that the extent of the effects produced by prescription is determined by the possession itself in accordance with the known principle *tantum praescriptum quantum possessum.* That is, there is as much prescription as there is possession. Castán comments that, since the only requirement for the existence of extraordinary prescription, aside from the passage of time, is possession, there is no doubt that the principle *tantum praescriptum quantum possessum* must be applied. He further observes, that although the Spanish Civil Code does not specifically refer to the concept of *usucapio libertatis* which frees the dominion of the liens and rights which encumber it, Spanish Mortgage Law regulates it in its Article 36 in reference to three distinct situations. Of the three, the one relevant to our inquiry, is that which exempts from the liberating effect of the prescription those rights of an *in rem* nature which are not susceptible of possession and enjoyment, such as mortgages. Stated in another manner, Spanish law provides that rights or liens which are not susceptible of possession are not extinguished by acquisition through prescription of the property encumbered by them. This explanation offered by Castán must be taken into account when one considers the portions of his treatise quoted by plaintiff for otherwise his position would be expressed partially and out of context. It is clear then that not *all* types of liens are freed by the action of prescription.

In defining those rights which secure obligations, Spanish commentator Luis Diez-Picazo in his work *Fundamentos del Derecho Civil Patrimonial,* Volume I, 1972 edition, at page 62, states that rights of an *in rem* nature encumber a particular object and serve as security to an obligation granting the creditor the right to obtain the value of the object for the satisfaction of his credit in case that the debtor does not comply voluntarily. These rights which serve as security and grant the creditor direct power over the property permit the creditor to receive the value of the encumbered property without considering who may be its owner or possessor at a given time. Thus, although the property may be transferred to another, the latter receives it subject to the lien evidenced by the existence of the creditor's rights and he must tolerate such lien.

Roce Sastre, a renowned Spanish commentator on mortgage law, emphasizes the importance of distinguishing the concept of prescription as a form of acquiring real property and extinguishing the property rights of an owner who has recorded his title in the registry from that known as *usucapio libertatis* which distinctly refers to the extinction of rights or liens over a property whose dominion has been obtained by prescription, ordinary or extraordinary. Prescription as a mode of acquisition refers exclusively to title or dominion and to those rights which are susceptible of possession for other rights which lack a possession context are excluded from its scope. He recognizes, as does Castán, that rights which are not susceptible of possession are not extinguished by acquiring through prescription the property encumbered by them. He further notes that a property so obtained is acquired *cum sua causa,* that is, with the liens and restrictions which encumbered it throughout the period of prescription. Thus, prescription operates only as to the title or dominion obtained by adverse possession during a certain period of time and only as to that. If the lien is neither incompatible with possession of the property nor susceptible by itself of such possession it is not affected.

Puig Brutau in his *Fundamentos de Derecho Civil,* III, Volume I, 1978 edition, at page 378, shares this same opinion. He

understands that in situations which have no direct relation with the state of possession which originated the prescription, the rights which are not susceptible of possession because of their inherent nature survive prescription since the holders of those rights should not be required to possess detailed knowledge of factual circumstances which normally do not come into play in the exercise of the action to enforce them. Thus, if rights, such as a mortgage lien or others, do not imply the immediate enjoyment of the property encumbered, the adverse possession by someone other than the owner ("usucapiente") does not affect them. This is also the opinion of other leading Spanish law commentators, who have stated in their comments to the Spanish Civil Code that acquisition by prescription does not suppose effects other than the conveyance of the property to a person different from its prior owner, without altering the contents of the title or dominion over the property. Scaevola, *Código Civil,* 32, Volume I, 1965 edition, pages 409–412. Thus, the title may be modified but not the contents of the right or lien over it, and, if the property acquired was encumbered by a lien there is no reason to suppose that the prescription itself, absent other causes, shall extinguish rights or liens, other than those pertaining to dominion, which attach over the object. The simple fact of prescription does not, by itself, result in such extinction. Accordingly, all that prescription implies is the acquisition of dominion over the property, subject to the same conditions and circumstances in which it was found at the time that prescription commenced since it does not have the effect, by itself, to extinguish or liberate other liens or rights over the property. He recognizes, however, that if during the period of prescription the holders of such rights or liens do not enforce them by exercising the actions available to them, the property which is acquired by prescription could then be obtained free of them. Yet, this is not an inevitable result of prescription, which only grants title, but is due to the fact that during the period of time of the prescription there was no exercise or enforcement of the lien. If such abandonment of the lien does not take place, the acquisition by prescription shall operate *cum sua causa* and, as a consequence thereof, the lien shall be respected.

█ In the best of all worlds, under the civil law theory advanced by plaintiffs they would have to assert that the government abandoned its liens by failure to seek enforcement and foreclosure. This they have not done and, more significantly, is not the situation present in this case for here the government made an assessment of the taxes owed since 1963, notified its debtors and acted to foreclose them. The theory on which plaintiffs based their legal arguments is premised on the arguable doctrine, unsupported by statutory provisions, case law or civil law principles, that the mere fact of extraordinary prescription by itself serves to free the property acquired by such means from all liens over it. See also Diez-Picazo and De León, *Sistema de Derecho Civil,* Vol. III, 1977 edition, at page 326. Plaintiffs' unacceptable interpretation of civil law and confused reasoning stems from the fact that they have failed to distinguish the effects of their alleged acquisition by extraordinary prescription from the concept of *usucapio libertatis,* the doctrine which, under certain circumstances not present in this case, serves as a liberating force. On the basis of the civil law principles examined, we conclude that, even assuming plaintiffs' claim of ownership via prescription to be true, the prescription itself does not affect the tax liens attached upon the Bayamón property to secure payment of debts owed by delinquent taxpayers to the government. Said liens had been previously adjudicated to be valid, subsisting liens over said property; these liens are not susceptible of possession or immediate enjoyment and, the government was not aware of the extraneous situation of a term of prescription running against its debtors. The taxes were assessed and the liens attached since the year 1963 and the government, within a reasonable time thereafter, exercised due diligence, evidenced by the two civil actions filed in 1964, to foreclose its tax liens. Accordingly, assuming pre-

scription to have occurred and even granting it retroactive effect to 1945, this does not operate to free the property of valid tax liens which encumber it. We, thus, rule that title to the Bayamón property described in the complaint, if ever proven by plaintiffs to have been acquired by extraordinary prescription, was received subject to the tax liens in favor of the United States totaling more than $4,000,000.00 which encumber it and as to which foreclosure has been ordered in Civil 67–64 and Civil 531–64, actions instituted by the government against the delinquent tax debtors Benítez Rexach and Lucienne D'Hotelle.

Furthermore, the arguable interpretation of civil law doctrine propounded by plaintiffs, creates a conflict between the civil law and the federal statutes which deal with the imposition of tax liens upon the property of those who neglect or refuse to pay taxes after demand. Federal law provides that when taxes are assessed and not paid, liens shall attach from the date of assessment upon all property or interest to property held by the delinquent taxpayer and the lien imposed continues until the debtor's tax liability is satisfied. Internal Revenue Code of 1954, 26 U.S.C. Secs. 6321, *et seq.* Federal law grants the government the right to secure the debts of taxpayers by attaching liens over their properties or interests to property in the amounts owed and provides the mechanism for enforcing such liens.

In the case of *United States of America v. Security Trust & Savings Bank,* 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950), where there was a question whether the law of California, as declared by its courts, was in conflict with the federal tax lien statute, the Court asserted: "'The effect of a lien in relation to a provision of federal law for the collection of debts owing the United States is always a federal question. Hence, although a state court's classification of a lien as specific and perfected is entitled to weight, it is subject to re-examination by this court." *Id.,* at 49–50, 71 S.Ct. at 113. The application of state law was again invoked in *United States v. Mitchell,* 403 U.S. 190, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971) [3] to defeat a taxpayer's liability to the federal government. There a married woman domiciled in Louisiana, exercising the privilege granted her by an article of the Louisiana Civil Code, formally renounced the community constituted with her husband whom she divorced immediately thereafter. Upon the dissolution of her marriage she received neither distribution of community property nor a property settlement. The Commissioner of Internal Revenue had determined tax deficiencies against her based upon half the community income for the tax years 1955–1959, inclusive, for federal income taxes and underpayment of estimated taxes. The Tax Court found that she possessed an ownership interest in half the community property, was personally responsible for the taxes on her share and ruled that her tax liability was not affected by her renunciation of the community under Louisiana law. The Fifth Circuit reversed holding that by renunciation she avoided any federal income tax liability on the community income. The Supreme Court reversed the appellate decision. Citing earlier cases, it asserted that federal tax liability follows ownership and, on the determination of ownership, state law governs. It also stated, however: "'The state law creates legal interests but the federal statute determines when and how they shall be taxed.'" *Id.,* at page 197, 91 S.Ct. at page 1768 (citation omitted). Ruling on Mrs. Mitchell's contention that her right to renounce the community and to place herself in the same position as if it had never existed is a substantive right in Louisiana, a state where civil law prevails, the Court stated: "The results urged by the respon-

---

**3.** An analogous case decided prior to *Mitchell* is *Carter v. United States,* 273 F.Supp. 595 (E.D.La., 1967), in which the Court ruled that a homestead exception filed by a taxpayer after the government's lien attached did not affect it, and stated: "Furthermore, even had the Decla- ration of Homestead been filed before the levying of the tax lien, it would still not have affected the Government's tax lien because State exemption laws are not effective against federal tax liens." *Id.,* at page 598.

dent might follow, of course, in connection with a tax or other obligation the collection of which is controlled by state law. But an exempt status under state law does not bind the federal collector. Federal law governs what is exempt from federal levy." *Id.*, at page 204, 91 S.Ct. at page 1771. Referring to Section 6321 of the Internal Revenue Code of 1954, it determined that the law was clear and left no room for automatic exemption of property that happens to be exempt under state law. It found that: "state law which exempts a husband's interest in community property from his premarital debts does not defeat collection of his federal income tax liability for premarital tax years from his interest in the community." In sum, the Court held that the law was clear, the taxes due and unpaid and if the wife were to prevail she would have the best of both worlds. The conflict between state laws and federal tax laws was dealt with directly by the Supreme Court in *United States v. Little Lake Misere Land Co., Inc.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), where the Court held that state laws could not be permitted to impair or confiscate the interests of the United States. Citing *RFC v. Beaver County,* 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946) the Court noted at page 596, 96 S.Ct. at page 2399, that in that case "the issue was whether the definition of 'real property,' owned by the RFC and authorized by Congress to be subject to state and local taxation, was to be derived from state law or to be fashioned· as an independent body of federal law." It cited with approval the conclusion reached in *Beaver County,* that " 'the congressional purpose can best be accomplished by application of settled state rules as to what constitutes "real property," ' " yet cautioned that in that case the Court had foreseen that its approach would be acceptable only " 'so long as it is plain, as it is here, that the state rules do not effect a discrimination against the government, or patently run counter to the terms of the Act.' " *Id.* In *Little Lake Misere Land Co., Inc.,* the Court rejected state law as a permissible choice, for the Louisiana legislation involved was hostile to the interests of the United States and deprived the government of contractual interests. Such is the situation which the Court confronts in this case, for to permit the interpretation of state law advanced by plaintiffs would seriously impair the interests of the United States by defeating valid tax liens which encumber the property claimed by them. These liens arose from substantial income tax debts validly assessed against Benítez Rexach's community property and the effect which plaintiffs have contended result from their alleged ownership by extraordinary prescription would serve to deprive the United States not only of the possibility of foreclosing said liens but also of its security. It is not inequitable to hold the Bayamón property responsible for the liens. The Benítez Rexachs, even if deemed prior owners, owed these debts, failed to pay them and any acquisition of the property by others free of the tax liens would run contrary to the national policy underlying federal tax laws. As stated in *Bull v. United States,* 295 U.S. 247, 258, 55 S.Ct. 695, 699, 79 L.Ed. 1421 (1935): "A tax is an exaction by the sovereign, and necessarily the sovereign has an enforceable claim against every one within the taxable class for the amount lawfully due from him." Neither the taxpayers nor plaintiffs fall within any exempted class. The only property which the federal tax statutes recognize as exempt from levy are those enumerated in 26 U.S.C. Sec. 6334 and the land claimed by plaintiffs does not fall within any of those categories. Subsection c of Section 6334 provides that no property or rights to property shall be exempt from levy other than the property specifically made exempt therein. Furthermore, Section 6323 provides that liens imposed by Section 6321 are valid, without notice, against all taxpayers except for the four specific classes which are enumerated in that section. Plaintiffs do not fall, neither have they contended that they do, within any of those four protected groups.

Finally, the parties should not forget that the United States does not merely hold liens over the Bayamón property. It has become,

through foreclosure of these liens, the owner of this property. It acquired title to the same at the judicial sales ordered in the prior civil actions before this Court instituted by the government. Thus, plaintiffs' complaint must deal with the government's title. Originally their complaint was addressed only to the corporate defendant and to the heirs of Félix Benítez Rexach. Since they were divested of title pursuant to the judgments entered in Civil 67–64 and 531–64 in favor of the United States, plaintiffs' claims of ownership must be directed to the United States and not against them. They must also confront the fact that those judgments are final. Their alleged right of ownership must take that important fact into account. Furthermore, as we stated before, plaintiffs must prove the fact of acquisition by extraordinary prescription before they can call into question the effects of the running of prescription. The fact that the court has passed upon the merits of their theory based on the liberating effect of prescription does not relieve them of the burden of proving ownership which is the primary question in this case. Our resolution of the issue concerning the effects of prescription had the purpose of accelerating the proceedings and of disposing of a major legal issue. Such ruling, however, does not end the case. Plaintiffs' asserted ownership is still in issue. Despite their repeated statements that they have established ownership pursuant to the requirements of the Civil Code of Puerto Rico in an uncontroverted manner, this is not the situation. Their claim of ownership is saturated with important issues of fact which preclude disposing of this particular matter summarily. The Court understands, as it has in the past, that the ownership question requires a plenary hearing which should not be further postponed. For the reasons stated, the motions for summary judgment filed by both parties are DENIED. We make clear, however, that the position advanced by the United States based on its theory that the property, if acquired, remains affected by its tax liens is a valid one. If plaintiffs acquired title at all, even

though subject to the liens, is yet to be established.

SO ORDERED.