Maria Elisa RODRIGUEZ, et al., Petitioners,

v.

ESCAMBRON DEVELOPMENT CORP., et al., Respondents.

No. 83-1439.

United States Court of Appeals, First Circuit.

Argued Feb. 6, 1984.

Decided Aug. 1, 1984.

Atty., Hato Rey, P.R., were on brief, for the United States of America.

Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.

WISDOM, Senior Circuit Judge.

The question this appeal presents is whether a title, acquired by acquisitive prescription (adverse possession), is subject to a federal tax lien against the prior owners of the land. The district court held that under the law of Puerto Rico acquisitive prescription will not extinguish an existing nonpossessory interest in land; alternatively, the court held that such an extinguishment would conflict with federal law. The court concluded that the possessors' rights are subject to the tax lien. *Rodriguez v. Escambrón Development Corp.*, 556 F.Supp. 703 (D.P.R.1983). We affirm. The effect and extinguishment of a federal tax lien are matters of federal law. Under federal law, a federal tax lien continues to encumber land, even after the legal transfer of the land.

## I.

In the words of the district court, this case began as "a relatively simple and brief" action to quiet title. The plaintiffs are the family of the late Jose Rivera Mulet. Rivera Mulet was the "Mayordomo", or manager, of a 42-cuerda[1] farm in Bayamón owned by Félix Benítez Rexach and his wife Lucienne d'Hotelle de Benítez Rexach. The plaintiffs allege that in 1945 Benítez Rexach "gave" Rivera Mulet 9.897 cuerdas of the farm to live on, and they have lived on that land in "uninterrupted adverse possession" ever since. Benítez Rexach was a well-known engineer and builder. He and his wife became embroiled in prolonged federal income tax litigation that eventually led to findings of deficiencies against them amounting to several mil-

David Rive Rivera, Hato Rey, P.R., with whom Calderon, Rosa-Silva & Vargas, Hato Rey, P.R., was on brief, for petitioners.

Carlton D. Powell, Atty., Tax Division, Dept. of Justice, Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Atty., Tax Div., Dept. of Justice, John J. McCarthy, Atty., Tax Division, Dept. of Justice, Washington, D.C., and Daniel F. Lopez-Romo, U.S.

* Of the Fifth Circuit, sitting by designation.

1. A cuerda is about the same as an acre.

lion dollars.[2] The United States assessed the deficiency at issue here in 1963. This assessment created a lien against the property of the taxpayers.[3] In 1964 the United States filed two civil actions for the purpose of foreclosing on the tax liens against various properties, including the Bayamón farm, belonging to Benítez Rexach, his wife, and various companies owned by them. The government also filed a notice of *lis pendens*. The court entered judgment for the United States in 1975 and 1977, and ordered foreclosure on the liens in March 1978.

In July 1978, the plaintiffs filed a complaint in the Superior Court of Puerto Rico against Escambrón Development, one of Benítez Rexach's companies, to quiet title to the 9.897 cuerdas on the ground of usucapion (acquisitive prescription) by possession for more than thirty years.[4] The United States intervened, asserting the tax liens, and removed the case to federal court. The plaintiffs and the United States both moved for summary judgment. The court denied the motions. The court held that the plaintiffs had not proved the elements of their claim of usucapion and that

any rights the plaintiffs did establish would be subject to the federal tax liens. The plaintiffs then asked the district court to certify an interlocutory appeal under 28 U.S.C. § 1292(b) (1982). The court certified the question as one of controlling importance, and this Court granted permission to appeal. We assume, for the purposes of deciding the present appeal, that the plaintiffs have met the Civil Code's requirements for acquisitive prescription.

## II.

The plaintiffs contend that, under the civil law of Puerto Rico, when they completed the thirty-year prescriptive period they acquired title to the land free of all encumbrances. They base this argument on the retroactive effect of completed prescription. As Planiol, one of the leading French commentators, explains this principle, "When prescription is completed, the possessor is deemed to be owner, not merely from the last day of the delay, but retroactively from the moment when the prescription began to run." M. Planiol & G. Ripert, *Treatise on the Civil Law*, vol.

**2.** See *United States v. Benítez Rexach*, 185 F.Supp. 465 (D.P.R.1960); *United States v. Benítez Rexach*, 200 F.Supp. 494 (D.P.R.1961); *United States v. Benítez Rexach*, 41 F.R.D. 180 (D.P.R.1966); *Benítez Rexach v. United States*, 390 F.2d 631 (1st Cir.), *cert. denied*, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968); *United States v. Benítez Rexach*, 331 F.Supp. 524 (D.P.R.1971), *vacated and remanded*, 482 F.2d 10 (1st Cir.), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973), *on remand sub nom. United States v. d'Hotelle de Benítez Rexach*, 411 F.Supp. 1288 (D.P.R.), *rev'd and remanded*, 558 F.2d 37 (1st Cir.1976). Lucienne d'Hotelle de Benítez Rexach died in 1968. Felix Benítez Rexach died in 1975. See 558 F.2d at 40. Remnants of the tax litigation continue to turn up in the pages of the federal reporters. In addition to the present case, *see United States v. Marin*, 651 F.2d 24 (1st Cir.1981); *United States v. Marin*, 720 F.2d 229 (1st Cir.1983) (per curiam); *In re Peñagaricano*, 571 F.Supp. 232 (D.P.R.1983).

**3.** The Internal Revenue Code provides,

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in

addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

26 U.S.C. § 6321 (1982).

"Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time."

*Id.* § 6322. A lien becomes "unenforceable by reason of lapse of time" upon expiration of the six-year statute of limitations for the collection of an assessment, *id.* § 6502(a), but if the government brings suit within that time the period is extended, and a judgment in favor of the United States extends the life of the lien indefinitely. *United States v. Overman*, 424 F.2d 1142, 1147–48 (9th Cir.1970); W. Plumb, *Federal Tax Liens* 49–51 (3d ed. 1972).

**4.** "Ownership and other property rights in real property shall also prescribe by uninterrupted possession of the same for thirty years without the necessity of title nor good faith and without distinction between present and absent persons...." 31 L.P.R.A. § 5280 (1967).

1, pt. 2, n. 2708, at 599 (La. State Law Inst. trans. 1959). Planiol states that the consequences of the retroactivity doctrine are: to consolidate title in the possessor; to secure the possessor's right to fruits collected during the prescriptive period; to vest ownership in a possessor who marries during the prescriptive period, rather than in the marital community; and to validate interests in the land granted by the possessor during the prescriptive period. *Id.* at 599–600. In discussing this last effect, Planiol writes,

> "Third parties who had acquired from the possessor real rights upon the immovable (servitudes, mortgages, etc.) during the duration of prescription, find them retroactively consolidated. It is just as if they had been granted by the true owner...."

*Id.* at 600. Planiol does not discuss what happens to real rights created by or against the true owner during the prescriptive period. The plaintiffs interpret the principle of retroactivity to mean that those rights are eliminated. They argue that when the thirty years prescription was completed in 1975, the law made them owners of the farm after 1945, when they first took possession. Accordingly, they argue, the government's tax lien was ineffective because in 1963, when the lien arose, the plaintiffs "already" owned the farm.

Since 1979 the Mortgage Law of Puerto Rico has explicitly provided:

> "Real rights limiting ownership which do not imply possession, acquired on someone else's right by a third party ... shall not be affected by the out-of-registry usucapion of the right on which they exist."

30 L.P.R.A. § 2357 (Supp.1982). Plaintiffs admit that this statute would prevent prescription of the lien now, but argue that the adoption of this statute in 1979 is strong evidence that, before 1979, nonpossessory liens were subject to usucapion. The district court rejected this argument after reviewing the opinions of a number of Spanish commentators, including Castán Tobeñas, Diez-Picazo, Roca Sastre, Puig Brutau, and Scaevola, all of whom agree that a nonpossessory real right is not susceptible to extinguishment by acquisitive prescription. 556 F.Supp. at 707–09. On appeal the plaintiffs contend that these commentators based their opinions on a 1944 amendment to the Spanish Civil Code that is substantially equivalent to the 1979 amendment to the Puerto Rico Mortgage Law quoted above. The plaintiffs therefore argue that the district court effectively based its decision on the *present* law of Puerto Rico rather than that in effect in 1975. They submit that the law of Puerto Rico before 1979, and of Spain before 1944, gave an adverse possessor ownership free of any interests granted by or asserted against the prior owner.

There is some authority to support the plaintiffs' position. The plaintiffs cite the opinion of Guaroa Velázquez, a noted professor of law at the University of Puerto Rico, who wrote in 1937:

> "Important point. The title created by prescription is retroactive to the day possession began. The possessor who has taken by use [usucapido] can, therefore, invoke his right against the third party beginning that day. If, therefore, during that time, a creditor of the *true owner* acquired against the latter a mortgage or a privilege and filed them, this right will not be against the possessor who has taken by use. On the other hand, the real rights granted by the simple possessor will be consolidated by virtue of usucapion."

Velázquez, *Los Derechos Reales Principales* 326 (1937) (our translation). Acquisitive prescription represents in part a civil law policy in favor of simple titles. As the court stated in *Union Producing Co. v. Parkes,* 40 F.Supp. 163 (W.D.La.1940):

> "In order to insure simple and unentailed or uninvolved titles to real estate, it is the policy of [the civil] law, that there should be no encumbrances which shall prevent the running of the two major periods of 10 and 30 years over which a complete and indefeasible title to all of

the elements of ownership in land may be acquired....

" 'Our laws are marked by the simplicity of the titles by which property is held, and are utterly opposed to the suspended and uncertain ownership incident to substitutions, or the system of entails of the Common law. * * * ' *Succession of McCan,* 48 La.Ann. 145, at page 158, 19 So. 220, at page 221 [ (1895) ]."

40 F.Supp. at 166. It would be possible to extract from these comments a civil law policy to give the possessor who has had the benefit of prescription a title free of encumbrances for which he is not responsible.

On the other hand, that the Spanish and Puerto Rican codes were amended explicitly to prevent prescription of non-possessory liens is by no means conclusive evidence that such liens were previously subject to prescription. Even before the 1979 amendments, article 35 of the Puerto Rico Mortgage Law of 1893 provided:

"Prescription which does not require a good title (*justo titulo*) shall not prejudice a third party if the possession on which it is to be based does not appear of record.

"Nor shall prescription which requires a good title prejudice a third person if such title is not recorded.

"In either case the time of the prescription shall begin to run from the date of the record.

"With regard to the legal owner of the real property or interest which is in the process of prescribing, the title shall be determined and the time computed in accordance with the provisions of the common law [i.e., the Civil Code]."

30 L.P.R.A. § 60 (1967) (repealed 1979). These provisions appear to protect from unregistered usucapion third parties whose rights do not imply possession, while allowing usucapion of the possessory rights of the true owner and others. *See* Brau del Toro, *Apuntes para un Curso sobre el Estado del Derecho Inmobiliario Registral Puertorriqueño bajo la Ley Hipotecaria de 1893,* 48 Rev.Jur.U.P.R. 113, 359,

405–06 (1979); Martinez Irizarry, *Los Principios Hipotecarios bajo la Nueva Legislación en Puerto Rico,* 50 Rev.Jur.U.P.R. 195, 205 (1981). This construction accords with common sense: An adverse possessor's possession is not "adverse" to the owner of a nonpossessory interest. Because there is no apparent interference with the nonpossessory interest, the holder of that interest may never have any knowledge that the adverse possession exists.

Because of our usual deference to the local district judges of Puerto Rico on matters of Puerto Rican law, we are naturally inclined to affirm. *Medina v. Chase Manhattan Bank,* 737 F.2d 140, 145 (1st Cir. 1984); *Gual Morales v. Hernandez Vega,* 604 F.2d 730, 732 (1st Cir.1979); *Diaz-Buxo v. Trias Monge,* 593 F.2d 153, 156–57 (1st Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979); *Berrios Rivera v. British Ropes, Ltd.,* 575 F.2d 966, 970 (1st Cir.1978). The courts of Puerto Rico, however, could reach a different result from that reached by the district court in this case. Fortunately, we need not base our decision only on the district court's decision. Although an examination of Puerto Rican law is necessary for a complete understanding of the plaintiffs' arguments, this case is governed by *federal,* not Puerto Rican law. We therefore turn to a consideration of the federal issues, recognizing that Puerto Rican law provides the backdrop against which the federal law of tax lien priority and extinguishment must be determined.

### III.

■ A federal tax lien is wholly a creature of federal law. It is one of the "formidable arsenal of collection tools" necessary "to ensure the prompt and certain enforcement of the tax laws in a system relying primarily on self-reporting". *United States v. Rodgers,* 461 U.S. 677, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983). Accordingly, the effects, priority, enforcement, and extinguishment of a tax lien are federal concerns. The Internal Revenue Code "creates no property rights but mere-

ly attaches consequences, federally defined, to rights created under state law". *United States v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958). For this reason the court must first look to state law to ascertain the existence and nature of the property rights against which a tax lien has been asserted. *Aquilino v. United States*, 363 U.S. 509, 512–14, 80 S.Ct. 1277, 1279–81, 4 L.Ed.2d 1365 (1960). Once these rights have been determined, however, federal law governs whether these rights are "rights to property" to which a tax lien may attach. *Bess*, 357 U.S. at 56–57, 78 S.Ct. at 1057–1058; *Fidelity & Deposit Co. of Maryland v. New York City Housing Authority*, 241 F.2d 142, 144–45 (2d Cir.1957); Young, *Priority of the Federal Tax Lien*, 34 U.Chi.L.Rev. 723, 726–28 (1967). Once the tax lien attaches, the effects of that lien are also governed by federal law. *Rodgers*, 103 S.Ct. at 2137; *Aquilino*, 363 U.S. at 513–14, 80 S.Ct. at 1280–81. Congress or the courts may adopt state laws or procedures, but that choice is itself a matter of federal law. *See United States v. Brosnan*, 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960).

■ Federal law governs the priority of a tax lien against other rights to property.[5] *United States v. Equitable Life Assurance Society*, 384 U.S. 323, 328, 86 S.Ct. 1561, 1564, 16 L.Ed.2d 593 (1966); *Aquilino*, 363 U.S. at 514, 80 S.Ct. at 1280; *United States v. Acri*, 348 U.S. 211, 213, 75 S.Ct. 239, 241, 99 L.Ed. 264 (1955); *United States v. Security Trust and Savings Bank*, 340 U.S. 47, 49–50, 71 S.Ct. 111, 112–113, 95 L.Ed. 53 (1950). Congress has provided specific statutory rules for tax lien priorities as against most other liens. In some cases Congress has adopted state law; in others it has provided special protections. *See* 26 U.S.C. § 6323 (1982). Where Congress has not prescribed a different rule, however, the basic rule of the federal common law is "first in time, first in right": the tax lien[6] is junior only to liens that attached to the asset and became choate before the tax lien arose. *United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954); *Rice Investment Co. v. United States*, 625 F.2d 565, 572–73 (5th Cir.1980). Whether an interest is sufficiently "choate" to prime a federal tax lien is a question of federal law. *United States v. Pioneer American Insurance Co.*, 374 U.S. 84, 88–89, 83 S.Ct. 1651, 1654–1656, 10 L.Ed.2d 770 (1963); *Acri*, 348 U.S. at 213–14, 75 S.Ct. at 241–42.[7]

5. The priority assigned to tax liens serves a number of important federal purposes: most significantly, to reinforce the sanctions and deterrents necessary to operate a tax system based on self-assessment, but also to ensure the government's right to revenue and to provide "ceremonial" affirmance of the individual duty to abide by the tax laws. *See* Babitt and Freiman, *The Priority of Federal Tax Claims: Selected Problems and Theoretical Considerations*, 24 Case W.Res.L.Rev. 521, 552 (1973).

6. For non-tax liens, where there is less need for a uniform federal rule of priority, the courts may use state law even in the absence of congressional direction. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Chicago Title Ins. Co. v. Sherred Village Assocs.*, 708 F.2d 804 (1st Cir. 1983); *United States v. Deya*, 369 F.Supp. 1113 (D.P.R.1974). But "[t]he importance of securing adequate renenues to discharge national obligations justifies the extraordinary priority accorded federal tax liens through the choateness and first in time doctrines." *Kimbell Foods*, 440 U.S. at 734, 99 S.Ct. at 1461–62.

7. In 1966 Congress, responding to complaints that the court-developed rules of priority were incompatible with modern commercial practices, drastically curtailed the application of the doctrines of "first in time, first in right" and "choateness". Federal Tax Lien Act of 1966, Pub.L.No. 89–719, 80 Stat. 1125 (1966), codified in scattered sections of 26 U.S.C. (1982). "A major part of this act [was] designed to trim the government's power to collect tax claims, and to show a decent regard to the competing claims and interests of others who have had dealings with the taxpayer." Young, *Priority of the Federal Tax Lien*, 34 U.Chi.L.Rev. 723, 723 (1967). Some authors have expressed the view that Congress intended to do away with the "choateness" requirement altogether. *See* Newton & Stanford, *Federal Lien Priority: The Corralling of That Phantom "Choateness"*, 44 Tex.B.J. 273, 275; Babitt & Freiman, note 5, at 537. The Tax Lien Act does not, however, provide for every type of lien, and choateness continues to be a consideration in tax lien cases. *See J.D. Court, Inc. v. United States*, 712 F.2d 258, 262–263 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1708, 80 L.Ed.2d 182 (1984); Creedon, *The Fed-*

If the plaintiff's rights are treated as a lien in competition with the government's lien, the tax lien must prevail. It is beyond reasonable dispute that when the tax liens arose in 1963 the plaintiffs' rights were "inchoate". An interest is choate when "there is nothing more to be done to have a choate lien—when the identity of the lienor, the property subject to the lien, and the amount of the lien are established". *Pioneer American*, 374 U.S. at 89, 83 S.Ct. at 1655; *New Britain*, 347 U.S. at 84, 74 S.Ct. at 369; *see J.D. Court, Inc. v. United States*, 712 F.2d 258, 261 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1708, 80 L.Ed.2d 182 (1984). In 1963 the plaintiffs did not own the land: before their rights would be choate they had to maintain possession for another twelve years.[8] None of the requirements for a choate interest were satisfied until 1975.

■ The plaintiffs contend, however, that once prescription ran in 1975, Puerto Rican law made them owners of the property retroactively from 1945. They argue, therefore, that under *Aquilino*, the tax liens against the Benítez Rexaches cannot be enforced against their land because, as a matter of Puerto Rican law, the Benítez Rexaches had no property rights in the land in 1963.

This theory requires indulgence in a peculiar kind of double-think. Obviously, had the government enforced the lien in 1964 it could have done so, because the Benítez Rexaches owned the land. The same was true in 1965, and 1970, and 1974. But, according to the plaintiffs, in 1975 this historical reality vanished without a trace. Now we are asked to hold that the tax lien never attached because the Benítez Rexaches never owned the land. The Supreme Court has rejected efforts to apply "relation back" doctrine to subordinate a tax lien to a subsequently perfected state law lien. *See Security Trust*, 340 U.S. at 50, 71 S.Ct. at 113; *United States v. Waddill, Holland & Flinn, Inc.*, 323 U.S. 353, 356–60, 65 S.Ct. 304, 306–08, 89 L.Ed. 294 (1945).[9] By statute Congress has permitted a variety of after-perfected liens to prevail over a tax lien. Congress has not done so here. If the plaintiffs' interpretation of Puerto Rican law is correct, the legal fiction of retroactive prescription may give their ownership rights priority over liens created under state law. But the priority of the tax lien is governed by federal law, and federal law makes no provision for a subordination by use of a legal fiction.

## IV.

■ We next consider whether the plaintiffs' usucapion could extinguish the tax lien by extinguishing the property rights of the Benítez Rexaches. In *United*

eral Tax Lien Act of 1966—An Historic Breakthrough, 4 Harv.J. on Legis. 161, 197 (1967); Plumb, *Federal Liens and Priorities—Agenda for the Next Decade*, 77 Yale L.J. 228, 232 & n. 32 (1967).

8. *Cf. Calvit v. Mulhollan*, 12 Rob. 258 (La.1845): "[I]t cannot be pretended that the right to a part of the time necessary to prescribe, can be considered as a vested right. Such right is only vested when the prescription is completed; and until then, it may be destroyed by law, or by circumstances amounting to a suspension or interruption." *Id.* at 270–71. *See also Roussel v. Railways Realty Co.*, 9 Orleans App. 288, 132 La. 379, 394, 61 So. 833 (1912), *aff'd* 132 La. 379, 390–94, 61 So. 409, 413–14 (1913): "[T]hose who are mere possessors, with prescription running in their favor, *have no vested rights* in the property.... The *subsequent* sale of the property to defendant [by the pos-

sessors] ... gave to defendant only what its authors themselves then had, to-wit, only an inchoate, contingent, or expectant right to complete a title by prescription if not disturbed." 9 Orleans App. at 298–99, 132 La. at 398, 61 So. at 835.

9. *Cf. United States v. Mitchell*, 403 U.S. 190, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971). In *Mitchell* the Court rejected the argument that a wife could avoid tax liability for her half of community income by renouncing the community of gains, although under the Louisiana Civil code this act exonerated her from the debts of the community. The Court held that once tax liability had attached it could not be avoided even though Louisiana gave the wife the "right to renounce the community and to place herself in the same position as if it had never existed", 403 U.S. at 203, 91 S.Ct. at 1771.

*States v. Brosnan,* 363 U.S. 237, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960), the Court held that although the divestiture of a tax lien is a matter of federal law, state law would be adopted except to the extent that Congress prescribed different rules. Congress has enacted specific rules that substantially supersede the federal common law of *Brosnan,* although the statutes, like *Brosnan,* adopt many state procedures. *See, e.g.,* 26 U.S.C. §§ 6325, 7425 (1982). Both *Brosnan* and the relevant statutes are concerned with the power of the states to divest a *junior* tax lien. Although Congress has given some subsequent liens superpriority over federal liens, if the tax lien is properly filed and is *senior* under federal law it may not be extinguished by a state procedure enforcing a junior claim on the property, unless the United States consents.[10] *See Berlin v. United States,* 535 F.Supp. 298, 300–01 (E.D.N.Y.1982); W. Plumb, *Federal Tax Liens* 285 (3d ed. 1972). Nevertheless, a tax lien, whether senior or junior to other liens, may be extinguished if the property itself is extinguished. "[T]he Government's lien under § 6321 cannot extend beyond the property interests held by the delinquent taxpayer." *Rodgers,* 103 S.Ct. at 2141. Professor Bittker states,

"[T]he government's rights can rise no higher than those of the taxpayer to whom the property belongs; for example, the lien for a partner's unpaid income taxes attaches to his interest in the firm, not to the firm's assets. In the same vein, the lien arising from the unpaid taxes of a person who purchased property under a conditional sale or chattel mortgage agreement before the assessment was made attaches to the tax-

payer's equity and is inferior to the seller's security interest. Moreover, the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out; thus, a state judgment terminating the taxpayer's rights to an asset also extinguishes the federal tax lien attached thereto."

4 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 111.5.4, at 111–102 (footnotes omitted). Read literally, this principle might support an argument that the government's lien was extinguished at the same time as the Benítez Rexaches' ownership. The decisions that have followed this principle, however, are cases in which the taxpayer's interest subject to lien is a terminable interest: an option contract,[11] a lease,[12] or the buyer's forfeitable interest under an installment sales contract.[13] *See* W. Plumb, *Federal Tax Liens* 23 (3d ed. 1972). In these cases, the attached property right ceased to exist; accordingly, there was nothing left against which the government could assert its interest. In the present case, by contrast, the right to ownership of the 9.897 cuerdas at issue was never extinguished; rather, it passed from the owners to the plaintiffs. In *Rodgers* the Court, after referring to the Bittker commentary quoted above, added, "Of course, once a lien has attached to an interest in property, the lien cannot be extinguished (assuming proper filing and the like) simply by a transfer or conveyance of the interest". 103 S.Ct. at 2141 n. 16. The Court also held that the government may force the sale of property in which the taxpayer had an interest, even if the taxpayer has no current interest. 103 S.Ct. at 2142 n. 18. Similarly, in *Bess* the

10. The plaintiffs suggest that the government could "easily" have averted the effects of usucapion by filing a lawsuit naming the possessors as defendants. Such a suit would have given the plaintiffs notice of the government's lien and would have interrupted prescription. 31 L.P.R.A. § 5266 (1967). But the government is not required to give notice of its tax lien in any way other than the filing prescribed by statute. 26 U.S.C. § 6323(f)(3) (1982); *United States v. Union Central Life Ins. Co.,* 368 U.S. 291, 295–96, 82 S.Ct. 349, 352–53, 7 L.Ed.2d 294 (1961).

11. Rev.Rul. 54–154, 1954–1 C.B. 277.

12. *Carolina Apartment Investors "A" v. United States,* 39 A.F.T.R.2d ¶ 77–515, at 77–1045 (E.D. Cal.1977).

13. *Brookbank, Inc. v. Hubbard,* 712 F.2d 399, 400–01 (9th Cir.1983); *Runkel v. United States,* 527 F.2d 914, 917 (9th Cir.1975).

Court held that the taxpayer had a property interest in the cash surrender value of his life insurance; when he died, the government could assert a lien on the proceeds of the insurance, up to the cash surrender value, against the beneficiaries. 357 U.S. at 56–59, 78 S.Ct. at 1057–1060. We conclude that, under the federal tax laws, the government's tax lien passed along with ownership of the attached land.

We AFFIRM the district court's holding that any rights of the plaintiffs in the Bayamón property are subject to the government's tax liens. We REMAND the case for further proceedings in accordance with this opinion.